UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **LOEURTH SOK** )<br>)<br>Petitioner, )<br>)<br>)<br>v. )<br>)<br>)<br>**KATHLEEN DENNEHY,** )<br>)<br>Respondent. )<br>) | Civil Action No. 05-11358-RGS |

**PETITIONER LOUERTH SOK'S MEMORANDUM IN SUPPORT
OF RELIEF PURSUANT TO HIS HABEAS CORPUS PETITION**

**PRELIMINARY FACTS**

The Crimes for which Petitioner was charged were alleged to have occurred on January 9, 1999 in the City of Lowell. (Day 1, pg. 175.) One or more of the charges were alleged to have occurred against individuals Ronny Thethbun, Sophan Ham, Sokha Tath and Poeur Nao. The incident was alleged to have occurred at approximately 1:00

1

in the morning at the residence of the alleged victims, which was 91 Linden Street, Lowell, Massachusetts. (Day 1, pg. 139, 144.) The defendant, along with others, was alleged to have taken some jewelry, cash and cigarettes. (Day 1, pg. 175.)

There is conflicting testimony as to exactly when the crime was reported but, in any event, it was reported some time the next day. (Day 2, pg. 116.) Both the prosecutor and defense counsel were in agreement that several hours after the victims were allegedly robbed, they called the defendant's sister, whose name is Aun Sok, who was approximately seventeen years old at the time. (Day 2, pg. 49, 50 and Day 3, pg. 216.) Aun Sok and defendant Loeurth Sok lived with their parents approximately 1 or 2 blocks away from the victims house. (Day 2, pg. 49, 50.) Aun Sok was also friends with one or more of the victims. (Day 3, pg. 218.) Surprisingly the victims claimed that they called defendant's sister so that she could contact the police about the crime and allegedly help with the translation. (Day 2, pg. 49, 50.) However, Officer Mendes testified that victim Sokha Tath spoke pretty good English and he was able to get a good account of the incident by directly talking to him. (Day 2, pg. 93.) Victim witness Sophan Ham also testified that Tath spoke English to police. (Day 2, page 118.) It is particularly noteworthy that witness Tath never mentioned defendant Sok's name to this officer when the case was first investigated despite the fact that Tath spoke pretty good English, as reported by officer Mendes. (Day 2, pg. 93, 97.) Sokha Tath had resided in the United States for about 13 years at the time of the incident. (Day 1, pg. 139.) Sokha Tath's mother, Poeur Nao, lived with the defendant's family for two years prior to the alleged crimes and knew defendant Sok. (Day 3, pg. 218.)

It was also acknowledged that there was another translator who was at the

scene of the crime at the time that the police arrived and his name was Sokchea Poev. (Day 2, pg. 89, 90.) Sokchea Poev lived at 87 Linden Street, which is one or two houses away from where the alleged crime occurred at 91 Linden Street in Lowell. (Day 2, pg. 89, 90.) Again when the crime was initially investigated and circumstances of the crime were fresh in the victims minds no mention was made to this translator or to the police that defendant Sok was in anyway involved in the alleged crimes. (Day 2, pg. 15; Day 4, pg. 60. 61.)

The prosecution and defense were in agreement that at the time that the police were initially contacted on January 9, 1999, the victims never mentioned to the defendant's sister, Aun Sok, to the police, to the other translator Sokchea Poev, or to anyone else, that Loeurth Sok, the defendant, was in any way allegedly involved in the alleged robbery/home invasion/assault. (Day 1, pg. 225; Day 2, pg. 16, 72; Day 4, pg. 60, 61.)

The prosecution and defense were in agreement that there was no mention of the defendant's name, until 11 days after the incident when one the witnesses allegedly decided to tell the police during questioning that they thought it was Louerth Sok who committed the crime. (Day 2, pg. 15; Day 3, pg. 21.)

An individual named John Prum, was alleged to have committed the crime with Loeurth Sok. (Day 2, pg. 38.) John Prum was arrested and indicted for the same or similar offenses against the same victims. (Day 2, pg. 38, Appendix, pg. 21-24.) He had not given a confession. (Day 4, pg. 186.) John Prum was tried prior to Loeurth Sok and was acquitted on all charges. (Appendix, pg. 21-24.) Witness for the prosecution, Sokha Tath, testified in both trials. (Appendix, pg. 21-24.) The victims

gave detailed statements implicating defendant Sok and defendant Prum and allegedly picked both defendants photographs out of a police "composite" and then subsequently testified at a grand jury implicating both defendants. (Day 3, pg.25; Day 1, pg. 38.) When Tath testified at John Prum's trial, he said that he was "mistaken" about John Prum's involvement. (Appendix, pg. 24.) John Prum was acquitted of all charges. (Appendix, pg 21-24.)

Also at the trial of John Prum an invididual by the name of Ronny Thethbun, who was a victim and witness in alleged crimes committed by Sok and Prum, testified that the police showed her a photo array. (Day 4, pg. 96, 97 - See Trial Exhibit 9.) She testified that at the time officer Conroy showed her the composite of the photos, defendant Sok's photo had been circled. (Day 4, pg. 96, 97.) She testified that she recognized Sok from the neighborhood but was uncertain as to whether or not he was involved in the alleged home invasion and related crimes. (Day 4, pg. 97.) The prosecution and the defense were in agreement that defendant Sok was known by some of the alleged victims prior to the crime. (Day 4, pg. 97.) In fact, victim Poeur Nao use to live with the defendant's family and was a good friend of defendant's sister, Aun Sok. (Day 3, pg. 218.)

Ronny Thethbun could not testify at the trial of defendant Sok for medical reasons. (Day 4, pg. 77.) However her testimony from John Prum's trial was read into the record and was part of the evidence in the trial of Sok. (Day 4, pg. 89.) Unfortunately and what defendant asserts is reversible error, the trial judge also allowed an unsworn statement that Ronny Thethbun had allegedly given to the police. (Day 4, pg. 79.) The statement had not been subjected to cross examination at the time it was

made. ( Day 4, pg. 81.) Because Ronny Tethbun did not testify at defendant Sok's trial his attorney had no way to cross examine as to the accuracy and truthfulness of the statement allegedly given to the police. ( Day 4, pg. 72.)

Subsequent to the alleged home invasion/robbery/assault, one or more of the alleged victims conversed in a friendly manner with the defendant, joked with the defendant, worked with him and shared rides to work with the defendant, as they worked at the same place of employment. (Day 1, pg. 176.)

There was not any finger print evidence introduced in the trial which showed that defendant had ever been in the premises of the alleged victims.  (See lack of fingerprint evidence in Trial Exhibits.)  The victims testified that all of the robbers wore ski masks. (Day 1, pg. 201.) There was no physical evidence which independently linked the defendant to the crime, such as jewelry found in his house or on his possession or anything else which related to the crime, or had defendants fingerprints on it. (See Trial Exhibits.)  In fact, defendant's finger prints were not found on any of the physical evidence which was introduced into the trial.  (See lack of fingerprint evidence in Trial Exhibits.)  Nor was defendant ever at any time to have been found to have been in possession of any firearm, which was alleged to have been used by him in the alleged crime. (See Trial Exhibits.)

Most unusually, Officer Conroy never testified that he ever inquired from Defendant Sok as to the whereabouts of the alleged gun used to commit the crimes. (Motion Hearing, pg. 1-100.) If Sok allegedly voluntarily confessed then why not give up the jewelry and the gun, which would have verified his alleged voluntary confession and would have restored the possessions to the victims.

The defendant was arrested for the alleged crime approximately 37 days after the first witness had allegedly implicated him in the crime. (Day 3, pg. 96.)

Detective Conroy alleged that there was such a long delay in the arrest of Sok because he was allegedly waiting to talk with one of the victims, Ronny Thethbun. (Day 3, pg. 96.) After her interview with the police she later testified at Prum's trial that it was actually the police who suggested Sok's involvement to her. (Day 4, pg. 97.) The defendant was arrested on a Friday night after the Court had closed, and was taken from his home during the gathering of friends and family who were at defendant's house to mourn the death of his father, who died several days before defendant was arrested. (Day 3, pg. 247.)

Defendant was taken to the basement of the Lowell Police Station and interrogated concerning the crimes on the following Saturday evening, which was approximately 26 hours after the defendant's arrest. The defendant had not slept and had not eaten for the 26 hours that he was in custody prior to the interrogation. (Motion Hearing, pg. 62-63)

Defendant was interrogated by a single officer, Detective Philip Conroy, who claimed that the defendant voluntarily signed and waived his right to Miranda, his right to be interrogated more than six hours after the incident and his right to have his confession recorded. (Day 3, pg. 115-116.) The defendant denied that he understood his rights and denied that he freely and voluntarily signed the waivers and made the confession. (Day 3, pg. 279-288.) Defendant asserted that he did not fully understand his Miranda rights or his other rights, and testified that he was intimidated and threatened by Detective Conroy. (Day 3, pg. 279-288.) Defendant testified that when

6

he waived his rights and signed his confession, which was typed by Detective Conroy, he was intimated and threatened by the officer. (Day 3, pg. 279-288.) Defendant was in a vunerable state as he was suffering from hunger, lack of sleep and depression as a result of his his father's death a few days before his arrest. (Day 3, pg. 279-288; Day 4, pg. 97.)

Ben Holland a witness called by the prosecution had also testified that Detective Conroy interrogated him alone and coerced him into signing a statement against Sok. (Day 4, pg. 116, 123.) He was not charged with the alleged crimes as were Sok and Prum but he testified that Conroy threatened to charge him if he did not cooperate. (Day 4, pg. 116, 123.)

Sok also testified that he misunderstood the meaning of the language in the Miranda form and the other waiver forms that were presented to him. (Day 3, pg. 279-288.) There were no other witnesses to defendant's alleged confession. (Day 3, pg. 115-116.) The confession was not recorded by audio or video tape. (See Trial Exhibits.) Defendant did not have any attorney present, an interpreter, or any other person present at the time he made the alleged confession. (Day 3, pg. 115-116.) It was just Louerth Sok and Detective Conroy in the basement of the Lowell Police station. (Day 3, pg. 115-116.) The defendant was an Asian immigrant and 20 years old at the time the alleged voluntary confession was made. (Day 3, pg. 240.) He failed to complete High School. (Day 3, pg. 241.) The defendant was small in size and weight in comparison to his interrogator, Detective Conroy. ( Day 3, pg. 285.)

Public Defense Counsel filed a Motion To Suppress Defendant's Confession. (Day 4, pg. 177.) The Honorable James F. McHugh denied the Motion after hearing on

July 13, 1999. (Addendum pg. 1-10.) The case was tried before the Honorable Judge Fabricant on December 5, 2000 in the Lowell Superior Court. (Appendix, pg. 10-15.) Defendant's alleged voluntary confession was allowed as evidence in the trial. (See Trial Exhibits.)

The defendant was found guilty on all counts and sentenced (with substantial difficulty over the convoluted sentencing parameters in the home invasion statute) by Judge Fabricant on December 21, 2000. (Addendum to Brief, pg. 21.)

At the sentencing hearing Judge Fabricant felt that the defendant deserved no more than eight to twelve years to serve, given the fact that he was young and had no substantial prior criminal record. (Addendum to Brief, pg. 22.) The Judge, however, felt constrained by case law and sentenced the defendant to a minimum of twenty years due to previous interpretations of the home invasion statute, Massachusetts General Laws Chapter 265, 18C. (Addendum to Brief, pg. 21.) The Judge incorrectly assumed that the statute and case law required incarceration for a minimum of twenty years for first time offenders. In fact the statute does not. (See Addendum to Brief Disposition, pg. 21.)

## GROUND 1

**<u>Petitioner did not make a knowing, voluntary and intelligent waiver of his Miranda Rights and other rights regarding self incrimination, right to legal counsel and right not to be questioned for lengthy periods while in custody and under duress.</u>**

Counsel, on behalf of the defendant, filed a Motion to Suppress the Defendant's Confession on July 6, 1999. (Addendum, pg 10.) Defense counsel raised the issues of defendant's waivers regarding Miranda, Rosario and his right to have his confession

8

electronically recorded were not knowing, intelligent and voluntary. (Motion Hearing, pg. 94.) It was argued by defendant's counsel at the Suppression Hearing that the Motion Judge should focus not on Detective Conroy's subjective interpretation of whether or not Defendant Sok understood his Miranda and other rights, but rather did the defendant in fact fully understand these rights and knowingly, intelligently and voluntarily waive these rights. (Motion Hearing, pg. 94.) Defense counsel argued that defendant's testimony clearly evidenced that he did not understand the true meaning of his rights and therefore there could not have been a valid waiver. (Motion Hearing, pg. 94.)

Defendant testified that he thought the right to remain silent meant that he had to be quiet and that the only time that he could talk was when the officer was talking to him. (Motion Hearing, pg. 67.) He thought his right to a lawyer meant that he only had a right to a lawyer when he went to court, and did not realize the he had a right to a lawyer at the time that he was being questioned by Detective Conroy. (Motion Hearing, pg. 68.)

Detective Conroy told the defendant that unless he signed the paper (waiver) that he would go to jail for 50 years. (Motion Hearing, pg. 69.) "Because he told me to sign, so I had to sign". (Motion Hearing, pg. 68.) Defendant stated that he did not fully understand what the waivers meant, but he signed them because Officer Conroy told him he had to sign the paper. (Motion Hearing, pg. 69.)

Defendant testified that when he told Detective Conroy that the statements [his confession] that Conroy typed were false, that Detective Conroy hit him, slammed him on the table and asked him to fight him one on one. (Motion Hearing, pg. 70, 73.) No

9

one else was present during the entire time that Detective Conroy was interrogating the defendant. (Day 3, pg. 115-116.)  The Prosecution also called witness Ben Holland, who also testified that Conroy threatened him into signing a statement against Sok. Ben Holland was not charged but he testified that Conroy would not let him go, nor formally arrest him, and told him he was going to charge him unless he cooperated with Conroy. (Day 4, pg. 116, 123.)

The defendant was born in Cambodia.  (Day 3, pg. 240.)  At the time of his arrest defendant lived with his little sister and his mother. (Motion Hearing, pg. 51.)  His father had recently passed away. (Motion Hearing, pg. 51.)  Defendant was 20 years old at the time of the of Motion Hearing.  (Motion Hearing, pg. 51.)  He had not graduated high school. (Motion Hearing, pg. 51.)   At the time of his arrest the defendant felt confused and depressed as a result of his father just passing away.  (Motion Hearing, pg. 58, 59.) Defendant was taken into custody on a Friday evening after the court had closed. (Motion Hearing, pg. 9-10.)  Defendant had not slept in the 24 -26 hours prior to Detective Conroy's interrogation. He took only one bite of a hard sandwich that was given to him in the 24-26 hours he was in custody prior to Detective Conroy's interrogation.  (Motion Hearing, pg. 63.)  Defendant stated that he did not have a chance to read the waiver forms and that Detective Conroy insisted that he sign them. (Motion Hearing, pg. 66, 67.)

Detective Conroy testified that he provided the defendant a sheet of paper with Miranda rights in English and in Cambodian. (Day 3, pg. 63, 64.)  Detective Conroy did *not* testify that he made available to the defendant his waiver of any other rights, except the Miranda warning in defendants native language, Khmer [Cambodian].  Detective

Conroy offered no explanation as to why he offered the Miranda warnings in Khmer [Cambodian] but did not offer a written Khmer [Cambodian] version of "the Rosario Ruling or the six hour waiver of court" or his right to have his confession electronically recorded. (Day 3, pg. 63-65.)

There was no testimony by Detective Conroy that he asked in the Motion to Suppress transcript, or the trial transcript, the defendant if he wanted to have an interpreter present during the interrogation. The prosecution did not offer any evidence that the defendant had the ability to understand the English written language as compared to audibly being able to recognize and speak some English.

Detective Conroy claimed that he had explained to the defendant what his rights were. (Day 3, pg. 46, 60.) Detective Conroy felt the need to read the Miranda warnings to the defendant as opposed to just giving him the Miranda in written form. (Day 3, pg. 48, 60.) Detective Conroy testified that allegedly he read the various Miranda, Rosario, Right to be Recorded warnings and waivers to the defendant. (Day 3, pg. 45.) He then claimed that he had the defendant silently read the statements. At no point throughout the trial did Detective Conroy state that he had defendant read the statements out loud. (Day 3, pg. 45.) If he did then it would be an indication that the defendant could at least read and articulate the written words.

Defense counsel objected to the confession being offered into evidence. (Day 3, pg. 69.) At the trial, defense counsel also objected to defendant's confession and waiver of rights from being presented to the jury on the grounds that an independent determination of the voluntariness had not yet been determined by the trial court. (Day 3, pg. 50-59.) The Trial Court did reference the fact that the Motion Judge had already

decided the issues regarding the challenges to the confession. (Day 3, pg. 53.) At the time defendant's alleged confession was submitted to the jury the Trial Court did not make an independent finding as to the voluntariness of defendant's statement but rather summarily decided that the defendant had, in fact, made a voluntary waiver of his rights. (Day 3, pg. 53-56.) This decision was made, however, prior to defendant testifying and prior to defendant being given an opportunity to cross-examine the police detective Conroy who alleged that the waivers and confession were in fact voluntary. (Day 3, pg. 50.)

    Defendant did not contest the issue at trial that he had the ability to understand most English when it is spoken. However it is plainly obvious from defendant's testimony that his ability to understand the true meaning of his rights was not adequate as a voluntary knowing and intelligent waiver. The prosecution never established at trial or during the suppression hearing that the defendant could adequately read and fully understand the written English language.

    There was no testimony by Detective Conroy at the trial that he read word for word to Loeurth Sok his Miranda and his right not to be questioned after being in custody for six hours under Rosario and his Right to have his confession electronically recorded. While it is true that Detective Conroy stated that he read defendant his rights and then the district attorney had Detective Conroy read the rights to the jury, Detective Conroy never stated he read the rights word for word to the defendant, he did say he read each line. Defendant asserts, however, the manner in which Detective Conroy paraphrased the Rosario Right evidences a misstatement of that Right. (Day 3, pg. 45.) The prosecutor did have Detective Conroy read the various rights forms to the jury word

for word. (Day 3, pg. 60.) For some reason Detective Conroy in addition to allegedly reading defendant's rights to the defendant, then claimed he explained defendant's right to him. (Day 3, pg. 60.) The question was never asked of Detective Conroy exactly what he said when he claimed that he "explained that document". (Day 3, pg. 48.) In fact, Detective Conroy misstates the Miranda warning while reading it to the jury. (Day 3, pg. 48.) Detective Conroy also incorrectly stated defendants rights under Rosario when he explained to the jury what he told the defendant was the meaning of his rights under Rosario *"I had asked him and advised him of the Rosario ruling or the six hour waiver of court. Court was going to be first arraigned or next arraigned on Monday of the following week of the next week. So being the fact that I believe was a Saturday, the 27th, that court would not be open until Monday and I wanted him to be advised of that".* (Day 3, pg. 46, 47.) This explanation makes it seem as though defendant Sok has no hope of seeing a judicial officer until Conroy is finished with him. More importantly, Conroy's "explanation" never mentioned to Sok that the police had no right to question him for more than six hours after his arrest.

    Defendant was a high school drop out. (Motion Hearing, pg. 52.) At home the defendant speaks Khmer as opposed to English. (Motion Hearing, pg. 53.) Detective Conroy states that after he typed defendant's confession he read it to him. (Motion Hearing, pg 47.) As with the alleged waiver of defendants rights, there is no testimony that Detective Conroy read the confession word for word to the defendant but rather the Detective just claimed that he read it to the defendant. Detective Conroy typed the alleged confession of the defendant, it was not in defendant's own hand writing. (Day 3,

13

pg. 66.) Defense counsel objected to the confession being offered into evidence. (Day 3, pg. 69.)

Judge McHugh denied defendant's Motion To Suppress. (Addendum to Brief, pg. 5.) He acknowledged that defendant was born in Cambodia in 1979, came to the U. S. when he was six years old, and was twenty years old when arrested by officer Conroy. He also found that the defendant Sok spoke Khmer at home and with his friends but also stated he is perfectly familiar with *spoken* English and that he understood his Miranda warnings. (Addendum to Brief pg. 1-10.) The motion judge does not give specifics as to how he arrived at this conclusion. (See pg. 1-10 Addendum to Brief.) The direct examination by Sok's attorney evidences that Sok does not have a good command of the English language and he significantly struggles to articulate his thoughts.

*"Like, he said–like the thing that–he keep repeating the stuff that he said to me, like the part where he said I'm going to jail, this and that. He said he know that I did it. He say that they saw me, this and that. He said–like, I was threatened. Like, Im going to jail for a long time, that's what, you know, the same thing he said. (Motion Hearing, pg. 69.)*

*And No. 4, you have the rights to talk to a lawyer. But I didn't know about—the part of the lawyers, I thought at the courts I could get a lawyer. I'm like, when he read to me do you understand about you have the rights to remain silence, yes, I understood that part. I thought I understood–I mean. That part remain silence, that's what I thought I understand. (Motion Hearing, pg. 86-87.)*

*The one that you have the rights to have—I can't. You have the rights to talk—you have the rights to talk to a lawyer. That part. What did you understand it to mean? That part, yes. I don't like, that part, I thought I had some rights to talk to a lawyer after I'm going to court. After I finish court, I have the rights to talk to a lawyer. I didn't know that I had the rights to talk to a lawyer while Phil [Officer Conroy] was questioning me.* (Motion Hearing, pg. 66.)

*Now, was there anything else that made you feel that you had to sign the papers? Yes. He was—I was like, I feel like I was threatened. Why? Because he, he said that—he said I'm guilty. He said if I don't sign a paper or cooperate with him, I'm going to jail for 50 years, I wouldn't even see daylight. I wouldn't see this and that. You know? And I'm scared, too. Because I don't know nothing about, like stuff like that. You know?* (Motion Hearing, pg. 68.)

*I asked him to—after I finished. You're talking about the statement and typing and whatever? Yes, I asked him to use the —he said only if I finish the statement or whatever, sign the statement or whatever, he's going to let me use the phone to call my mom.* (Motion Hearing, pg. 70.) *And did you do that? Because he said you have to sign the paper and stuff like that, and I had to sign the—I signed the paper, and after that he let me use the phone, and I called my mom, like he—I called my mom. And he told me to—when you call her, just tell her that you're doing fine here.* (Motion Hearing, pg. 70.)

Officer Conroy never offered any explanation as to why he did not tape record the reading of defendant's rights or defendant's alleged confession.

15

The question of voluntariness of defendant's confession turns on whether the suspect's free will had been over-bourne by law enforcement officials. See <u>Rogers v. Richmond</u> 365 U.S. 534, 544 (1961). A conviction founded in whole or in part on statements that are the product of physical or psychological coercion deprive the defendant to his due process of law under the 14th Amendment. <u>Commonwealth v. Mahnke</u> 368 Mass. 662, 679 (1975). Convictions which involve prolonged questioning under adverse circumstances are clearly suspect. <u>Commonwealth v. Makarewicz</u> 333 Mass. 575, 585-586 (1956). There is no "acid test" of voluntariness. <u>Commonwealth v. Mahnke</u> <u>supra</u> 680. The question of voluntariness is determined on a case by case basis in light of the "totality of the circumstances". <u>Procunier v. Atchley</u> 400 U.S. 446, 453 (1971), <u>Commonwealth v. Cruz</u> 373 Mass. 676, 688 (1977). The relevant factors in assessing voluntariness include the time and conditions under which the questioning took place, the content and form of the questions put to the suspect and the physical and mental condition of the suspect during the period of interrogation. <u>Commonwealth v. Makarewicz</u> <u>supra</u> 587.

In regard to the suspect, the Courts are directed to look at the defendant's age, education, intelligence, emotional stability, and experience within the criminal justice system. <u>Commonwealth v. Mandley</u> 397 Mass. 410, 413 (1986). The focus is on manner and duration of the interrogation as well as the vulnerabilities of the defendant at the time. <u>Procunier v. Atchley</u> <u>supra</u>, 400 U.S. 453-454. The process weighs the circumstances of pressure against the suspects power of resistence. <u>Fikes v. Alabama</u> 352 U.S. 191 (1957). The task is to ascertain whether a particular defendant's will was overcome by the particular pressures exerted upon him. <u>Commonwealth v. Harris</u> 364

Mass. 236 (1973). <u>Commonwealth v. Shelby</u> 420 Mass. 656 (1995). In determining voluntariness, the Supreme Judicial Court has become increasingly sensitive to consideration of the defendant's mental condition. <u>Commonwealth v. Chung</u> 378 Mass. 451 (1979). The police may not use threats or inducements to secure a confession. <u>Commonwealth v. Sousa</u> 418 Mass. 478 (1998). <u>Commonwealth v. Meehan</u> 377 Mass. 552, 563-564 (1979). <u>Commonwealth v. Larkin</u> 429 Mass. 426, 438 (1999).

Additionally, in a fairly recent case <u>Commonwealth v. Vuthy Seng</u>, 436 Mass 537(2002) the Supreme Judicial Court held that the Miranda Warning that was given to defendant Seng in Khmer was inadequate because it was incomplete and subject to misinterpretation and vacated Seng's conviction accordingly. Vuthy Seng was arrested subsequent to Sok and was arrested by the same police force, in the same city. There is no evidence that the Khmer warning in Seng was different from the Miranda warning that was given to defendant Sok. The Commonwealth has the burden of proof as to voluntariness. <u>Seng</u> supra. The <u>Seng</u> case also emphasized that if two sets of warnings are given and one is defective or incomplete and the circumstances are such that the defendant would be confused by any discrepancy or omission, a waiver so obtained is not voluntary. Id at 547. Because officer Conroy never stated the exact words he used to "explain" Sok's rights and in effect misstated the true meaning of defendant's Rosario rights when he attempted to "explain" it to the jury, the Commonwealth clearly did not meet their very high burden.

"What Miranda [and arguably Rosario] requires is meaningful advice to the unlettered and unlearned in language which they can comprehend and which they can knowingly act <u>Coyote v. United States</u>, 380 F2d 305,308 (10th Cir) cer. Denied, 389 U.S.

992 (1967) quoted in Commonwealth v. Vuthy Seng 436 Mass 537,544 (2002) See also Commonwealth v. Boncore, 412 Mass 1013,1015(1992).

Whether defendant was given adequate Miranda warnings is a question of law that is reviewed de novo by the appellate court. United States v. Connell, 869 F.2nd 1349,1351 (9th cir. 1989) cited in Commonwealth v. Vuthy Seng 436 Mass 537, 543 (2002).

Clearly the burden is on the Commonwealth to prove that the defendant knowingly, intelligently and voluntarily made a confession. Any doubt needs to be resolved in favor of the defendant. There was no physical evidence linking defendant Sok to the crimes. The witnesses testified that the perpetrators were masked. There was no fingerprint evidence. The other defendant, John Prum, who did not give a confession was acquitted. Sok's confession was not in defendant's own handwriting. There was no videotape or audio tape of defendant's confession. Defendant was not represented by counsel at the time of confession. No one else, including an interpreter, was in the room with officer Conroy and the defendant at the time that he allegedly confessed. Defendant was uneducated, English was not his first language, he was very vulnerable given the fact that he had been incarcerated for a long period of time, had not eaten and his father had just passed away. There was no justifiable reason why officer Conroy did not tape record the alleged confession of defendant Sok. A video or simple audio recording could have removed all doubt as to the voluntariness of the alleged confession. The Supreme Judicial Court has made it clear that the failure of the police to record electronically statements made in a place of custody should be considered in deciding the voluntariness of any statement, whether the defendant was

properly advised of his rights, and whether any statement attributed to the defendant was made. Commonwealth v. Diaz 422 Mass 269 (1996).

Detective Conroy testified that he read the waivers concerning *Miranda* and *Rosario* rights to the defendant and also had defendant read them. He then claimed that he "explained" them to defendant Sok. There is no reason to read and explain something that a person is supposed to understand merely by reading it. Conroy must have had concerns as to defendant's ability to plainly and fully understand his rights. An additional problem is that there was no interpreter in the room and Conroy never specified the exact words he used to "explain" the meaning to defendant Sok. When Conroy testified before the jury and gave an example of how he explained defendant's rights to him he misrepresented the true meaning of the defendant's rights and paraphrased it in a way that made it seem as though the rights were an advantage to the police and not to defendant Sok.    The Commonwealth had the burden of proving that defendant was fully capable of understanding American phraseology and written English. There was no evidence presented by the Commonwealth which would have established that defendant clearly and fully understood all his rights; including that his right to a lawyer meant that he had a right to a lawyer at all stages of the proceedings, including during police interrogation and at the time of his alleged confession and not just when he went to court. There was no evidence presented at either the trial or suppression hearing to firmly establish that the defendant understood legal American phraseology and written English at the time of his alleged voluntary confession.

Even if there is doubt as to whether or not officer Conroy used physical intimidation against defendant Sok, who was much smaller than him, there is no doubt

19

that defendant Sok was very vulnerable and was clearly confused as to his rights at the time he made his confession and therefore it was not completely knowingly, voluntarily and intelligently made.

Upon review The Appeals Court for The Commonwealth of Massachusetts merely stated " for the reasons stated by the motion judge in his memorandum and order on defendant's motion to suppress custodial statement , at A.1-10, the commonwealth met its burden.  See <u>Commonwealth v. Desouza</u>, 428 Mass 667,669 (1999)"(page2-3 of Decision of the Appeals Court for The Commonwealth).

Courts should indulge every reasonable presumption against waiver of fundamental constitutional rights <u>Johnson v. Zerbst</u> 304 U.S. 458, 464, (1958).  Every effort must be made by police to see to it that the defendant did not unknowingly relinquish constitutional protections indispensable to a fair trial.  <u>Schneckloth v. Bustamonte</u> 412 U.S. 218, 242 (1973). The appellate court did not  engage in any independent analysis of what took place at the Motion to Suppress hearing.  It did not address the issues raised by appellants brief other than to make the general statement that the Motion Judge was correct. It did not speak to fact that some of the rights and waivers were provided in English and some both English and Khmer.  There was no independent analysis regarding defendant's testimony that he really did not understand what the rights meant, or the fact that his father had very recently died, nor did it comment on the fact that the police officer could have easily recorded the confession and choose not to do so, or the fact that the police waited to arrest the defendant until Friday knowing that he could not be brought before the court until the following Monday, thereby giving the police officer ample time to " sweat" the defendant.  Based on the totality of the