# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
**LOEURTH SOK,**                        )
                                        )
      **Petitioner,**              )
                                        )
**v.**                                  )    **Civil Action No. 05-11358-RGS**
                                        )
**KATHLEEN DENNEHY,**                   )
                                        )
      **Respondent.**              )
_____)

## RESPONDENT'S MEMORANDUM OF LAW IN OPPOSITION TO PETITION

The Respondent[1] hereby files this memorandum of law in opposition to the habeas corpus petition (the "Petition") filed by Petitioner Loeurth Sok (the "Petitioner"), an inmate at the Massachusetts Correctional Institution at Norfolk, Massachusetts ("MCI-Norfolk"). The Petitioner cannot satisfy the high standards necessary to justify the issuance of a writ of habeas corpus.

---

[1] Pursuant to the Report and Recommendation on Motion to Dismiss Petition issued by Magistrate Judge Robert B. Collings, the Petitioner has requested that he be allowed to amend his Petition to substitute Luis Spencer, the superintendent of MCI-Norfolk, as the respondent to this action. (Docket Item No. 11 at 2 n.1 ("[P]etitioner should file a motion with the Court to modify the petition in order to name the proper respondent."); Docket Item No. 12 at 2 ("Petitioner . . . requests that this Honorable Court allow him to amend his petition to substitute as the Respondent . . . Luis Spencer . . . .").) That request has not yet been acted upon by this Court. This Memorandum is filed on behalf of whichever Massachusetts state official serves as respondent to this action and treats all those who have been named as respondent as one "Respondent." All prior filings by respondents to this action are hereby adopted by the filer of this Memorandum.

I.    **BACKGROUND**

A.    **The Petitioner's Crime and Interrogation**

The facts stated herein are derived from the opinion issued by the Memorandum & Order

on Defendant's Motion to Suppress Custodial Statement that was issued by the Middlesex

County, Massachusetts, Superior Court (the "Superior Court") and adopted by the Massachusetts

Appeals Court ("the Appeals Court") in connection with the Petitioner's state prosecution.[2]

Under 28 U.S.C. § 2254(e)(1), factual determinations set forth in that decision or otherwise

rendered by state courts must "be presumed to be correct.  The applicant shall have the burden of

rebutting the presumption of correctness by clear and convincing evidence."  "Unless the

petitioner can carry this heavy burden, a federal habeas court must credit the state court's

findings of fact-and that remains true when those findings are made by a state appellate court as

well as when they are made by a state trial court."  Rashad v. Walsh, 300 F.3d 27, 35 (1st Cir.

2002).

> Or about January 9, 1999, three or four individuals forced their way into an apartment in Lowell and robbed the occupants.  During the course of the robbery, a number of the victims were able to obtain views of their assailants' faces sufficient to enable them later to identify the assailants from photo arrays.  As a consequence of the photographic identifications and of other information that came to the attention of Lowell police during the course of their investigation, police made a decision to arrest [the Petitioner], among others, and to charge him with participation in the robbery.

> At approximately 6:30 p.m. on February 26, 1999, [the detective at issue], an experienced Lowell police detective who had been involved in the investigation, went with another Lowell police detective to the apartment where [the Petitioner] was living with members of his family.  [The detective] entered the house after obtaining permission to do so and

---

[2] The motion judge indicated that such facts constitute his findings and conclusions "[b]ased on the evidence presented during the course of the hearing on [the Petitioner's] motion – at which [the Petitioner] and [the detective at issue] were the only witnesses."  (Docket Item No. 1 Ex. 1 at A-1 to A-8.)

spoke with various members of [the Petitioner's] family. Those present included not only members of [the Petitioner's] immediate family but also of his extended family who had gathered for the funeral of [the Petitioner's] father who had died the previous week.

When [the detective] arrived, [the Petitioner], having recently returned home from work, was in the shower. [The detective] waited outside the bathroom, where [the Petitioner] was taking his shower until he was finished. When the shower stopped, [the detective] spoke to [the Petitioner] through the closed bathroom door to alert him to his presence. Ultimately, [the Petitioner] emerged from the bathroom. As he did, there was a brief exchange between the two regarding why [the detective] was there. [The Petitioner] knew [the detective], at least by his first name, from various benign encounters the two had had as [the detective] patrolled the neighborhood where [the Petitioner] lived.

[The detective] asked [the Petitioner] to go into his room and get dressed. [The Petitioner] complied. [The detective] and the other officer followed [the Petitioner] into the bedroom. Once in the bedroom, [the detective] told [the Petitioner] that he was under arrest, that he would explain the charges to him later and that he should get dressed. Once [the Petitioner] had dressed, [the detective] told [the Petitioner] that he did not want [the Petitioner] to say anything about the arrest to members of his family as they were leaving the apartment and that, when they were outside, [the detective] would tell him more about what it was that had led to his arrest. The two detectives then left the apartment with [the Petitioner] without incident.

When they all were outside the apartment, [the detective] told [the Petitioner] that he had been arrested for the home invasion that had taken place on January 9. [The Petitioner] denied any knowledge of, or participation in, that incident. [The detective] then took [the Petitioner] to the Lowell police station where he was booked and processed.

At approximately 9:00 p.m., [the Petitioner] told [the detective] that he wanted to speak to him. [The detective] told [the Petitioner] that he did not have time to do so then but would talk with him at some later time.

February 26, the day [the Petitioner] was arrested, was a Friday. After the booking process was finished, [the Petitioner] was placed in a cell in the Lowell police station. At some point the following morning, he was given a submarine sandwich to eat and he ate some of it. He remained in the cell sleeping, on and off, throughout the remainder of Saturday.

At approximately 7:00 p.m. on Saturday evening, [the detective] went to [the Petitioner's] cell and said that he had time to talk to him if the [the Petitioner] still was interested in doing so. [The Petitioner] said that he was. [The detective] then asked [the Petitioner] if he wanted anything to eat. [The Petitioner] said that he did and that he also wanted some "smokes." [The detective] said that he would see what he could do to satisfy both of [the Petitioner's] requests.

At approximately 9:15 p.m., [the detective] returned to [the Petitioner's] cell and told him that he had something for him to eat upstairs in an interview room. He led the [the Petitioner] out of the cell and took him, without handcuffs or other restraints to the interview room where the food, which [the detective] had obtained from a local Wendy's fast food emporium, was on the table. [The Petitioner] ate the food and then smoked at least one of the cigarettes that [the detective] also had obtained. While smoking the cigarette, [the Petitioner] asked [the detective] if he could smoke cigarettes in his cell. [The detective] told him that he could not.

The interview room to which [the detective] had taken [the Petitioner] was approximately 8 by 10 feet. The room had windows, but the windows were high on the walls and one who was sitting could not see through them. In the room were a desk and several chairs and a computer with the allied keyboard, monitor and printer. [The detective] told [the Petitioner] that, before they could talk about anything substantive, he had to advise [the Petitioner] about a number of [the Petitioner's] rights. Thereupon he read to [the Petitioner] from a sheet of paper routinely used by the Lowell police department in such circumstances on which were printed "Miranda warnings." The content of those warnings complied in all respects with the requirements of Miranda v. Arizona, 384 U.S. 436 (1966). When he had finished reading those "Miranda warnings", to [the Petitioner], [the detective] showed him the sheet from which he had been reading, asked [the Petitioner] to read the sheet, and watched as [the Petitioner] actually read it. [The detective] then asked [the Petitioner] to sign the sheet and watched as [the Petitioner] did so.

On February 26, [the Petitioner] was 20 years of age. He had been born in Cambodia in 1979 but came with his family to the United States in 1985 when he was approximately 6. Ultimately, he and his family moved to the Lowell area where he has remained ever since. He attended many Lowell public schools where all of his classes were taught in English. He remained in school until he was mid-way through the 11th grade. At that point he left school and began working. He has maintained employment, in one fashion or another, ever since.

[The Petitioner] speaks Khmer at home with his family and sometimes speaks it with his friends. Nevertheless, he is perfectly familiar with, and fluent in, spoken English, ideomatic and proper. He understood what [the detective] told him about his "Miranda rights" and he understood what he read on the "Miranda sheet" [the detective] gave him after his recitation had ended. [[The Petitioner] maintains that [the detective] only read him two of the eight paragraphs on the printed "Miranda" form and then refused to let him read the document before he signed it. [The Petitioner] stated that he was confused about the two paragraphs [the detective] did read. He testified that he thought his "right to remain silent" was an obligation he had to remain silent while in custody unless he was spoken to by a police officer. He also testified that he thought his right to talk to a lawyer for advice only applied when he went to court the following Monday. I reject that testimony, as I reject the rest of [the Petitioner's] patently incredible tale of what occurred that evening. In fact, [the Petitioner] knew full well the meaning of what [the detective] told him as evidenced by his own testimony at the hearing that, if [the detective] had let him read the "Miranda" sheet before signing it, he never would have signed it and never would have talked to [the detective].]

After [the Petitioner] finished reading and signing the "Miranda sheet," [the detective] told him that there were a couple of other preliminary matters he had to discuss with him. [The detective] then read him, and gave him a sheet of paper containing, his right to have his statement electronically recorded and his right to decline an interview more than six hours after his arrest unless he gave consent to that interview. [The Petitioner] understood what [the detective] told him and what he read on the pieces of paper [the detective] gave to him after discussing with him those rights verbally.

After those preliminaries were finished, [the detective] asked [the Petitioner] questions about the incident that had occurred on January 9. [The Petitioner] told [the detective] what he knew about that incident and his participation in it. There followed some questions and answers, back and forth, between [the detective] and [the Petitioner]. [The detective] typed [the Petitioner's] responses to those questions into the computer. In reducing those responses to writing, [the detective] did not always use precisely the words that [the Petitioner] had used but [the detective] placed words [the Petitioner] used in a context that fairly and accurately represented what [the Petitioner] had said.

When [the detective] finished typing, he printed a paper copy of his handiwork and asked [the Petitioner] to read it. [The Petitioner] did so. [The detective] then asked [the Petitioner] if there were any errors or matters that needed to be added to the statement and [the Petitioner]

replied that the[re] were not.  After that exchange, [the detective] asked [the Petitioner] if he would sign the statement.  [The Petitioner] both agreed to do so and did.

      The questioning process took approximately one hour from the time it began at approximately 9:20 p.m. [The Petitioner] had slept throughout the day and was not tired. Although he had not had much to eat throughout the course of the day, he had eaten to his satisfaction and had smoked to his satisfaction before the questioning began.  Neither hunger nor a desire for cigarette[s] influenced either his decision to speak or the content of what he said.  At the time he gave his statement, [the Petitioner] was not under the influence of any alcohol, drugs, liquor or narcotics.  He was not overcome by fear although he did have an appropriate apprehension about his circumstances.  [The detective] did not coerce him into giving the statement nor did he threaten him during the course of his interrogation.  [The Petitioner] spoke to [the detective] in order to give an account of events that minimized his involvement in them.  He did so voluntarily, freely and of his own will.

      [The Petitioner], in sum, knew the meaning of the "Miranda warnings" [the detective] read to him on the night of February 27 and was able to and did read and comprehend those warnings before he signed the "Miranda sheet" marked as Exhibit 1 at the hearing.  [The Petitioner] signed that sheet freely and voluntarily and with knowledge of what it meant at a time when he was not under the influence of any outside stimulus that forced him to do so.  His statement to [the detective] was entirely free and voluntary and followed a knowing, free and voluntary waiver of his "Miranda rights."

(Docket Item No. 1 Ex. 1 at A-1 to A-10 (citation omitted) (footnote integrated into body in brackets).)

### B.     The Petitioner's Prosecution and State Challenges to His Conviction

On March 31, 1999, the Petitioner was indicted by a Middlesex County, Massachusetts, grand jury on the following charges:  three counts of robbery while armed and masked or disguised (Counts 1, 2, and 3); one count of home invasion (Count 4); one count of indecent assault and battery on a person aged fourteen or over (Count 5); one count of assault with a dangerous weapon on a victim aged sixty or over (Count 6); and three counts of assault with a

dangerous weapon (Counts 7, 8, and 9).  (Docket Item No. 7 Ex. A.)  He pled not guilty to all counts at his arraignment on April 22, 1999.  (Id.)

The Petitioner was tried in the Superior Court before the Honorable Judith Fabricant and a jury over five days beginning on December 5, 2000.  (Id.)  On December 7, 2000, the Petitioner's counsel moved for a required finding of not guilty at the close of the Commonwealth's evidence, and it was denied.  (Id.)

Of consequence to the instant action is the fact that, outside the jury's presence on the fourth day of trial, the Petitioner's counsel asked to introduce a portion of the transcript of prior testimony given by one of the victims in the trial of one of the Petitioner's cohorts.  (Docket Item No. 1 Ex. 3 (Appeals Court decision) ("The defense sought and was allowed to read into evidence the prior recorded testimony of Ronny Thethbun."); Tr. IV:62:4 to IV:106:10.)[3]  The victim, a woman named Ronny Thethbun ("Thethbun"), was then in a hospital's intensive care unit.  (Id.)  While indicating that he would not object to the admission of the entire transcript, the Petitioner's counsel stated that he was only seeking to introduce one page.  (Id.)  In response to the Petitioner's counsel's request, the prosecutor argued that none of the transcript should be admitted because it was unreliable.  (Id.)  He explained that the case in which Thethbun testified involved different issues and that, at the time of her testimony, she was ill, not responsive, and contradicting herself.  (Id.)  At one point, the prosecutor also indicated that, if the transcript was admitted, a statement given by Thethbun to police should likewise be admitted.  (Id.)  The Petitioner's counsel objected to introduction of the police statement.  (Id.)  He argued that the prosecution should not be entitled to effectively cross-examine Thethbun by introducing the police statement, when it was able to cross-examine her when she testified in the prior trial.  (Id.)

He also indicated that the police statement included hearsay, included statements that were not relevant, and was prejudicial.  (Id.)  He did not specifically argue that the police statement should not be admitted on the grounds that he lacked the ability to cross-examine Thethbun at the time that the police statement was given or at trial.  (Id.)  The trial judge allowed the admission of the transcript, with a photo array that was an exhibit to it.  (Id.)  She agreed to redact the caption and sidebar conversations.  (Id.)  In light of her observation that Thethbun referred to and thus adopted the police statement in her testimony, the trial judge also decided to allow in the police statement.  (Id.)  After the jury returned, counsel stipulated that Thethbun had testified through an interpreter, and the Petitioner's counsel read from a portion of the transcript.  (Id.)  The prosecutor then read from a portion of the testimony and from the police statement.  (Id.)  The Petitioner's counsel noted his objection to the reading of the police statement for the same reasons as he offered previously.  (Id.)

The next day, at the close of all evidence, the Petitioner's counsel again moved for a required finding of not guilty.  (Docket Item No. 7 Ex. A; Tr. IV:148:23 to IV:160:17.)  While he began by stating that he was "going to renew [his] motion with regard to all of the indictments," he then proceeded to discuss only the charge of indecent assault and battery.  (Tr. IV:148:23 to IV:160:17.)  The prosecutor and trial judge likewise confined their comments to that charge. (Id.)  The Petitioner's motion was denied.  (Id.; Docket Item No. 7 Ex. A.)

On December 11, 2000, the Petitioner was found guilty on all nine counts against him. (Docket Item No. 7 Ex. A; Docket Item No. 1 Ex. 3 (Appeals Court opinion).)  That same day, the guilty verdict on the count for indecent assault and battery on a person aged fourteen or over (Count 5) was placed on file with his knowing consent.  (Docket Item No. 7 Ex. A; Pet. Ex. 3

---

[3] Portions of the transcript from the Petitioner's state-court trial are cited as:  Tr.

(Appeals Court opinion) ("[T]he defendant knowingly consented to the court's placing of this charge on file.").)[4]

On December 20, 2000, the Petitioner was ordered to serve the following sentences:  a term of imprisonment of between twenty years and twenty years and one day on the conviction for home invasion (Count 4); a term of imprisonment of between eight and twelve years on each of the convictions for armed robbery (Counts 1, 2, and 3), to be served concurrently with each other and with the sentence imposed in connection with the conviction for home invasion (Count 4); and a term of probation of five years with the conditions that he avoid direct and indirect contact with all victims and provide $100 in security on each of the remaining convictions (Counts 6, 7, 8, and 9), to be served concurrently with each other and to take effect on and after the sentence imposed in connection with the conviction for home invasion (Count 4).  (Docket Item No. 7 Ex. A.)  The Petitioner was also given credit for eleven days of time served and was assessed a $60 victim-witness fee, a $100 legal counsel fee, and a $50 probation supervision fee. (Id.)  He filed a notice of appeal that same day, and he filed a notice of appeal of his sentences to the Superior Court's Appellate Division on January 3, 2001.  (Id.)  Additionally, on January 18, 2001, he filed a motion to revise and revoke his sentence, which motion does not appear from the docket to have been acted upon by the Superior Court.  (Docket Item No. 7 Ex. B.)

The Petitioner's appeal of his convictions was entered on the docket of the Appeals Court on September 16, 2002.  (Docket Item No. 7 Ex. C.)  While that appeal was pending, on August 22, 2003, the Superior Court's Appellate Division affirmed his sentences and dismissed his

---

[Volume]:[page(s)]:[line number(s)].

[4] The Petition incorrectly states that the Petitioner was convicted on *four counts* of indecent assault and battery.  (Docket Item No. 1 ¶ 5.)  It also neglects to note the number of counts of assault with a dangerous weapon on which he was convicted and to recognize the distinction

appeal before that body. (Docket Item No. 7 Ex. B.) Then, on May 6, 2004, the Appeals Court rendered a decision vacating the sentence that had been imposed in connection with the Petitioner's conviction for home invasion with a firearm and remanded the case for resentencing on that count with a term not to exceed twenty years nor to be less than ten years. (Docket Item No. 7 Ex. C.) It did not otherwise disturb his convictions. (Id.)

On May 26, 2004, the Petitioner filed an Application for Leave to Obtain Further Appellate Review and supporting memorandum (the "ALOFAR") with the Massachusetts Supreme Judicial Court ("SJC"). (Docket Item No. 7 Ex. D.) His ALOFAR was denied on June 30, 2004. (Id.)

In light of the decision of the Appeals Court, on December 12, 2004, the Superior Court revised the Petitioner's sentence with respect to the conviction for home invasion (Count 4) by ordering him to serve a term of between ten and twelve years. (Docket Item No. 7 Ex. B.)

### C.    The Instant Habeas Corpus Action

The Petition at issue was filed in this Court on June 28, 2005. (Docket Item No. 1.) On March 24, 2006, the Respondent filed a motion to dismiss, in which she argued that the Petitioner had failed to exhaust state remedies with respect to all claims in his Petition and had named an improper party as respondent. (Docket Item Nos. 6, 7.) The Respondent's argument on the first of these issues focused on the Petitioner's failure to exhaust a portion of Claim 1, a portion of Claim 2, and a portion of Claim 4 of the Petition. (Docket Item No. 7 at 4-12.) The Petitioner opposed the motion on April 24, 2006. (Docket Item No. 10.)

In a January 25, 2007, decision, Magistrate Judge Robert B. Collings (the "Magistrate Judge") issued a Report and Recommendation on the Respondent's motion. (Docket Item No.

---

between the conviction for assault with a dangerous weapon on a victim aged sixty or over, and

11.)  Therein he accurately noted the portions of Claims 1, 2, and 4 of the Petition that the

Respondent contended was unexhausted.  (Compare id. at 14 with Docket Item No. 7 at 4-12.)

He concluded that Claim 1 had been sufficiently exhausted, that "Ground 2 is unexhausted," and

that the challenged portion of Claim 4 of the Petition also was not exhausted.  (Docket Item No.

11 at 14-21.)  While he declined to recommend dismissal based on the Petitioner's failure to

name the proper party as respondent, he did indicate that the Petitioner "should file a motion

with the Court to modify the petition in order to name the proper respondent."  (Id. at 2 n.1.)

Based on the above findings, the Magistrate Judge ruled as follows:

> I RECOMMEND that petitioner be given a period of THIRTY (30) days
> to file and serve a pleading in which he either (1) withdraws his
> unexhausted claims (Ground 2 and that portion of Ground 4 alleging that
> the [Massachusetts] Home Invasion statute is overbroad) or (2) seeks to
> stay the instant petition in accordance with the procedures set forth in
> [Rhines v. Weber, 544 U.S. 269 (2005),] and by making the showing
> required by the Rhines case.  If petitioner neither withdraws the
> unexhausted claims nor requests a stay within the time which the Court
> specifies, I FURTHER RECOMMEND that the Petition be DISMISSED.

(Docket Item No. 11 (footnote omitted).)

The Petitioner consequently filed a response to the Report and Recommendation, in

which he stated as follows:

> Now comes the petitioner Louerth Sok and in accordance with the Report
> and Recommendations of [the Magistrate Judge] entered on January 25,
> 2007 the respondent [sic] withdraws his unexhausted claims.  More
> specifically respondent [sic] withdraws that portion of Ground 2 of his
> Petition which alleges that the Trial Court refused to allow into evidence
> that co-defendant was acquitted of all charges.  Respondent also
> withdraws that portion of Ground 4 which claims that the Home Invasion
> Statute is overbroad.

(Docket Item No. 12 at 1.)  He also requested the ability to amend his Petition to substitute

current MCI-Norfolk Superintendent Luis Spencer as respondent.  (Id. at 2.)  As a result, this

---

the other convictions for assault with a dangerous weapon.  (Id.)

Court entered an order on March 6, 2007, in which it stated that the Petitioner, "responding to the Magistrate Judge's Report and Recommendation, has withdrawn the claims identified in the Report as unexhausted.  That being so, the case is <u>REMANDED</u> to [the Magistrate Judge] for a Report and Recommendation on the merits of the remaining claims."  (Docket Item No. 13.) The Respondent accordingly filed an answer to the Petition on March 16, 2007.  (Docket Item No. 14.)  Therein, she stated in part as follows:

> The Respondent treats the petition as omitting Ground Two in its entirety and omitting that portion of Ground Four in which the Petitioner claimed that the Massachusetts Home Invasion Statute was overbroad, in accordance with the Report and Recommendations of Magistrate Judge Collings, the Petitioner's Response to the Report and Recommendations, and the Court's Order of March 6, 2007.

(<u>Id.</u> at 1 n.1.)  The Petitioner did not challenge or otherwise respond to the foregoing assertion by the Respondent.

On August 31, 2007, the Petitioner filed a memorandum of law in support of his Petition (the "Memorandum").  (Docket Item Nos. 21-22.)  In his Memorandum, he presented arguments in support of Claim1, part of Claim 2, Claim 3, and part of Claim 4 of his Petition.  (<u>Id.</u>)

## II.    <u>ARGUMENT</u>

### A.    <u>The Petitioner's claims must be rejected if he cannot satisfy the high standards for demonstrating an entitlement to habeas corpus relief.</u>

Habeas corpus relief may not be granted unless stringent standards are satisfied. Congress has provided as follows:

> (a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States. . . .

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with

respect to any claim that was adjudicated on the merits in State court
proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the
Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination
of the facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas
corpus by a person in custody pursuant to the judgment of a State court, a
determination of a factual issue made by a State court shall be presumed to
be correct.  The applicant shall have the burden of rebutting the
presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254.  Given that the Petitioner does not appear to be claiming that any state-court

decision "was based on an unreasonable determination of the facts," he cannot obtain relief "with

respect to any claim that was adjudicated on the merits" at the state level unless he can

demonstrate that the resulting decision was "contrary to[] or involved an unreasonable

application of" clearly established Supreme Court precedent.  (Docket Item No. 1; Docket Item

Nos. 21-22.)  28 U.S.C. § 2254(d).

A state court's decision will be found "contrary to" established federal law only where

"the state court applies a rule that contradicts the governing law set forth in" Supreme Court

precedent or "the state court confronts a set of facts that are materially indistinguishable from a

decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme

Court] precedent."  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).[5]

---

[5] Even if the state court "applied a standard that was contrary to clearly established federal law[,
that fact] does not automatically entitle the petitioner to relief."  Aspen v. Bissonnette, 480 F.3d
571, 575 (1st Cir. 2007).  Given that "[a] writ of habeas corpus will issue only upon a showing
that the petitioner 'is in custody in violation of the Constitution or laws or treaties of the United
States' . . . a petitioner must show that his underlying detention is unlawful and not just that the
state court employed faulty reasoning in his case."  Id. (quoting 28 U.S.C. § 2254).

The decision will be determined to be "an unreasonable application" of Supreme Court case law "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407-09. For these purposes, "[t]he ultimate question . . . is not how well reasoned the state court decision is, but whether the outcome is reasonable." Hurtado v. Tucker, 245 F.3d 7, 20 (1st Cir. 2001) (adding that "even a poorly reasoned state opinion does not mean that the outcome represents an unreasonable application"). A decision that is incorrect does not necessarily rise to the level of being unreasonable. Williams, 529 U.S. at 365 ("[T]he most important point is that an unreasonable application of federal law is different from an incorrect application of federal law."); see also McCambridge v. Hall, 303 F.3d 24, 36 (1st Cir. 2002) ("[I]f it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application. . . . '[S]ome increment of incorrectness beyond error is required.'" (quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000))).

"[T]he phrase 'clearly established federal law, as determined by the Supreme Court of the United States' . . . refers to the holdings, as opposed to the dicta of [the Supreme] Court's decisions." Id. at 412 (quoting 28 U.S.C. § 2254(d)).

Any "post-AEDPA, preserved federal constitutional claim[]" that was not "'adjudicated on the merits in State court proceedings' . . . in federal constitutional terms" must be reviewed by this Court de novo. Kater v. Maloney, 459 F.3d 56, 58 (1st Cir. 2006) (quoting 28 U.S.C. § 2254(d) and applying holding in Fortini v. Murphy, 257 F.3d 39, 47 (1st Cir. 2001)). However, while this Court must "consider such claims 'de novo,' that does not mean [it should] review those claims as an original matter, as if the claims were raised on direct appeal." Id. "Rather, the claims of habeas petitioners, even on de novo review under Fortini, continue to be limited by

the principles laid out in <u>Teague v. Lane</u>, 489 U.S. 288 (1989), and its progeny, which generally

bar claims that require the application or announcement of 'new rules' of law." <u>Id.</u> at 58-59

(citation omitted).  "[A] rule is new under <u>Teague</u> if it is not 'compelled by existing precedent.'"

<u>Id.</u> at 63 (quoting <u>Curtis v. Duval</u>, 124 F.3d 1, 5 (1st Cir. 1997)).[6]  Thus, where the restrictions

set forth in 28 U.S.C. § 2254 do not apply, it is nevertheless the case that "the focus . . . is, in

essence, on the substantive standards set by clearly established federal law" at the time that the

petitioner's conviction became final.  <u>Id.</u> at 63-64.

        The above rules of law do not necessarily end the inquiry, however.  Even if this Court

were to conclude that an error of the "trial type" amounted to a constitutional violation, it must

still decline to grant habeas corpus relief if that error was harmless.  <u>See</u> <u>Brecht v. Abrahamson</u>,

507 U.S. 619, 623, 637-38 (1993).  On habeas corpus review, an error of the "trial type" is

considered harmless if it did not have "'a substantial and injurious effect or influence in

determining the jury's verdict.'"  <u>Id.</u> (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776

(1946), and holding that standard set forth in that case as opposed to standard set forth in

<u>Chapman v. California</u>, 386 U.S. 18 (1967), and utilized on direct review, "applies in

_____

[6] The <u>Kater</u> court noted that "[t]he general rule [in <u>Teague</u>] is subject to exceptions," citing
<u>Sepulveda v. United States</u>, 330 F.3d 55, 59-60 (1st Cir.2003).  <u>Kater</u>, 459 F.3d at 63 n.5.
The <u>Sepulveda</u> court explained as follows:
        The <u>Teague</u> bar admits of two exceptions.  The first allows retroactive application of new
        rules that either (a) prohibit criminal punishment for certain types of primary conduct, or
        (b) forbid the imposition of certain categories of punishment for particular classes of
        defendants. . . . The second <u>Teague</u> exception allows retroactive application of
        "watershed rules of criminal procedure implicating the fundamental fairness and accuracy
        of the criminal proceeding."  For this exception to flourish, the new rule must pass two
        tests.  First, "[i]nfringement of the rule must seriously diminish the likelihood of
        obtaining an accurate conviction."  Second, the new rule must itself alter the accepted
        understanding of the bedrock procedural elements essential to the integrity and fairness of
        a criminal proceeding.

determining whether habeas relief must be granted because of constitutional error of the trial type").  As the Supreme Court recently made clear, that standard must be applied on such review "whether or not the state appellate court recognized the error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt' standard set forth in Chapman [v. California]," the appropriate standard for use on direct review.  Fry v. Pliler, 127 S. Ct. 2321, 2327-28 (2007) (quoting Chapman, 386 U.S. 18, and observing that "it certainly makes no sense to require formal application of both tests (AEDPA/Chapman and Brecht) when the latter obviously subsumes the former").

As demonstrated in the sections below, application of the foregoing standards compels the conclusion that habeas corpus relief is not warranted here.

**B.     The Appeals Court's rejection of the Petitioner's waiver claim neither was contrary to nor involved an unreasonable application of Supreme Court precedent.**

The Petitioner cannot obtain habeas corpus relief based on his first claim, wherein he alleges that his waiver of his Miranda rights[7] and certain other rights was insufficient.  (Docket Item No. 1 ¶ 12.)[8]  The Appeals Court's decision on this issue neither "was contrary to, [nor]

---

330 F.3d at 59-60 (citations omitted) (quoting Graham v. Collins, 506 U.S. 461, 478 (1993), in the first instance, and quoting Tyler v. Cain, 533 U.S. 656, 665 (2001), in the second instance). As in Kater, such exceptions are "not relevant here."  459 F.3d at 63 n.5.

[7] See Miranda v. Arizona, 384 U.S. 436, 444-45 (1966).

[8] To the extent that the Petitioner's claim in based in part on insufficiencies in his waiver of his so-called Rosario rights and right to have his interview electronically recorded, both rights are creatures of state law, not federal law.  See Commonwealth v. Rosario, 422 Mass. 48, 661 N.E.2d 71 (1996) (providing that statement will not be excluded on ground of delay in arraignment, it is made within six hours of arrest or right to be arraigned without unreasonable delay is properly waive); Commonwealth v. DiGiambattista, 442 Mass. 423, 813 N.E.2d 516 (2004) (providing that defendant is entitled to cautionary instruction where confession is not recorded).  In any event, such rights were waived on the same occasion and under the same circumstances as the Petitioner's Miranda rights.

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States."  28 U.S.C. § 2254.

>       As to such waivers, the Supreme Court has explained as follows:

>       Miranda holds that "[t]he defendant may waive effectuation" of the rights
>       conveyed in the warnings "provided the waiver is made voluntarily,
>       knowingly and intelligently."  The inquiry has two distinct dimensions.
>       First, the relinquishment of the right must have been voluntary in the sense
>       that it was the product of a free and deliberate choice rather than
>       intimidation, coercion, or deception.  Second, the waiver must have been
>       made with a full awareness of both the nature of the right being abandoned
>       and the consequences of the decision to abandon it.

Moran v. Burbine, 475 U.S. 412, 421 (1986) (citations omitted) (quoting Miranda v. Arizona,

384 U.S. 436, 444 (1966)).  Elaborating on the concept of voluntariness, the Court has indicated

that "[a]bsent evidence that [the defendant's] 'will [was] overborne and his capacity for self-

determination critically impaired' because of coercive police conduct, his waiver of his Fifth

Amendment privilege was voluntary under this Court's decision in Miranda."  Colorado v.

Spring, 479 U.S. 564, 574 (1987) (citations omitted) (quoting Culombe v. Connecticut, 367 U.S.

568, 602, (1961) (opinion of Frankfurter, J.)).  As to knowledge, it has affirmed that "the

Constitution does not require that a criminal suspect know and understand every possible

consequence of a waiver of the Fifth Amendment privilege."  Id.  Moreover, "a valid waiver

does not require that an individual be informed of all information 'useful' in making his decision

or all information that 'might . . . affec[t] his decision to confess.'"  Id. at 576 (quoting Moran,

475 U.S. at 422, and drawing distinction between information that could affect wisdom of waiver

and whether it knowing and voluntary).  The above factors are evaluated based on the "'totality

of the circumstances surrounding the interrogation.'"  Id. (quoting Fare v. Michael C., 442 U.S.

707, 725 (1979)).  The Court has added that "giving the warnings and getting a waiver has

generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary

even though given after warnings and voluntary waiver of rights requires unusual stamina, and

litigation over voluntariness tends to end with the finding of a valid waiver." <u>Missouri v.</u>

<u>Seibert</u>, 542 U.S. 600, 608-09 (2004).

The decision of the Appeals Court cannot be found to have been "contrary to" these

principles.  It disposed of the waiver issue by stating:

> <u>Miranda</u>. "Whether the defendant was given adequate Miranda
> warnings is a question of law that is reviewed de novo by the appellate
> court." <u>Commonwealth v. Seng</u>, 436 Mass. 537, 543 (2002), quoting from
> <u>United States v. Connell</u>, 869 F.2d 1349, 1351 (9th Cir.1989).  When
> determining whether the defendant voluntarily waived his Miranda rights,
> "the question is 'whether the will of the defendant had been overborne so
> that the statement was not his free and voluntary act' . . . ."
> <u>Commonwealth v. Cruz</u>, 373 Mass. 676, 688 (1977), quoting from
> <u>Procunier v. Atchley</u>, 400 U.S. 446, 453 (1971).  Determining the
> voluntariness of a waiver requires an evaluation of the "totality of the
> circumstances, including promises or other inducements, conduct of the
> defendant, the defendant's age, education, intelligence and emotional
> stability, experience with and in the criminal justice system, physical and
> mental condition, the initiator of the discussion of a deal or leniency . . .
> and the details of the interrogation, including the recitation of Miranda
> warnings." <u>Commonwealth v. Mandile</u>, 397 Mass. 410, 413 (1986).
>
> For the reasons set forth by the motion judge in his memorandum and
> order on defendant's motion to suppress custodial statement, at A. 1-10,
> the Commonwealth met its burden.  <u>See</u> <u>Commonwealth v. DeSouza,</u> 428
> Mass. 667, 669 (1999).

(Docket Item No. 1 Ex. 3 (Appeals Court opinion).)   The "reasons set forth by the motion

judge" are those stated <u>supra</u> Section I.A.  (<u>Id</u>.)

As the Appeals Court cited the correct rules of law, even quoting indirectly from an

appropriate Supreme Court case, and it did not reach an outcome different than that reached in

any Supreme Court case with materially indistinguishable facts, its decision cannot be deemed

contrary to clearly established federal law.  <u>Williams</u>, 529 U.S. at 405-06.

The court also did not unreasonably apply such precedent. It adopted a ten-page, thorough analysis of the waiver issue conducted by the trial court. (Docket Item No. 1 Ex. 1 at A-1 to A-10.) As that analysis reveals in part, at the relevant time, the Petitioner was twenty-years old and had lived in the United States for approximately fourteen years. (Id. at A-5.) He attended Lowell public schools until the eleventh grade, taking all classes in English, and then began steadily working. (Id.) While he speoke Khmer, the motion judge who heard him testify found that "he is perfectly familiar with, and fluent in, spoken English, idiomatic and proper." (Id.)

The Petitioner was arrested without incident and shortly thereafter indicated that he would like to speak to the detective at issue. (Id. at A-2 to A-3.) The next day, he was fed, had an opportunity to sleep, was approached by the detective in the evening, and stated that he would still like to talk. (Id. at A-3, A-7.) The detective indicated that he would look into getting him food and "smokes," and then provided them to him within a short time. (Id. at A-3 to A-4.) He took the Petitioner without restraints to eat and be questioned in an 8-foot by 10-foot room with windows and some furniture. (Id. at A-4.) The Petitioner ate and smoked to his satisfaction. (Id. at A-7.)

The detective then read the Petitioner his Miranda rights, watched the Petitioner read them himself, and watched him sign the waiver. (Id. at A-5, A-7.) The Petitioner was found to have "understood what [the detective] told him about his 'Miranda rights' and he understood what he read on the 'Miranda sheet' [that the detective] gave him after his recitation had ended." (Id. at A-5, A-7 to A-8.) The detective additionally read him and showed him his rights "to have his statement electronically recorded and his right to decline an interview more than six hours after his arrest unless he gave consent to that interview." (Id. at A-6.) Here, too, he was found to

have "understood what [the detective] told him and what he read . . . after discussing with him those rights verbally." (Id. at A-6.)  The detective then questioned the Petitioner and received answers from him about the incident in question for about one hour, while the detective transcribed and paraphrased his statements on a computer.  (Id. at A-6, A-7.)  At the end of questioning, the Petitioner was given an opportunity to review and revise the typed statement, and declined to offer any changes.  (Id. at A-6 to A-7.)  He agreed to sign and did sign the statement.  (Id. at A-7.)

Neither the Petitioner's decision to speak nor the content of his statements was influenced was hunger or a desire to smoke, and he was not under the influence of "alcohol, drugs, liquor or narcotics." (Id.)  He was also not overcome by fear, threatened or coerced.  (Id.)  He was found to have spoken freely and voluntarily.  (Id.)  The Petitioner's allegations to the contrary were "reject[ed] . . . in [their] entirety" by the motion judge, who found them to be "patently incredible," "[to] make[] no sense, [to be] wholly inconsistent with [the Petitioner's] level of sophistication and fluency in the English language, and [to be] wholly inconsistent with [his] assessment of the credibility of [the detective and the Petitioner]."  (Id. at A-5 n.1, A-10.)

As referenced above, in this proceeding, the above facts are presumed to be true.  See 28 U.S.C. § 2254(e)(1).  The Petitioner certainly has not overcome this presumption through clear and convincing evidence.  Id.  Indeed, the factual determinations above relied largely on an assessment of the credibility of the Petitioner and the detective by the motion judge, a reevaluation of which would be inappropriate here.  See, e.g., Marshall v. Lonberger, 459 U.S. 422, 434 (1983) (stating that federal courts had "no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them" under former version of 28 U.S.C. § 2254(d), which established presumption of correctness for state

court determinations of merits of factual issue with exceptions for, inter alia, instance where habeas court concludes that factual determination is not fairly supported by record); Mastracchio v. Vose, 274 F.3d 590, 598 (1st Cir. 2001) (stating that, under current version of 28 U.S.C. § 2254, "a federal habeas court ordinarily refrains from revisiting credibility determinations as 'it would be wholly inappropriate for a federal court to repastinate soil already thoroughly plowed and delve into the veracity of the witnesses on habeas review'" (quoting Sanna v. Dipaolo, 265 F.3d 1, 10 (1st Cir. 2001) (involving petitioner who made no showing of "'clear and convincing evidence'" of incorrect factual determination, but "simply insist[ed] that [a witness'] testimony was untrustworthy")).  This rule is consistent with the widely-accepted principle that "[c]redibility is quintessentially a matter of fact, reserved in almost every circumstance for the trier."  Sanna, 265 F.3d at 10.  The facts above should leave no doubt that the Petitioner's waiver was "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  Moran, 475 U.S. at 421.  The Appeals Court's decision cannot be found to have been unreasonable.

Even if this Court were to find that the Appeals Court erred in its determination, such error must be found harmless in light of the sheer weight of evidence against the Petitioner. Such is an appropriate factor to take into account in a harmlessness analysis.  See, e.g., Brecht, 507 U.S. at 639 (finding harmlessness in part because "the State's evidence of guilt was, if not overwhelming, certainly weighty").  The Petitioner and his cohorts robbed a group of four victims.  (Tr. I:153-157; Tr. II:35-36, 105-108.)  Their course of conduct in the victims' home consisted of a number of acts recalled by the victims.  (Id.)  The Petitioner made a number of statements while in the victims' home, and they recognized his voice, having heard it multiple

21

times before.  (Tr. I:159; Tr. II:108-110, II:128-129.)  One victim recognized his manner of

walking and his eyes.  (Tr. I:159-61, Tr. I:182.)  Another saw the Petitioner's face at a point

when he lifted his mask, and she recognized him because she knew his family.  (Tr. II:47-48.)

She later signed a statement and identified the Petitioner from a photo array.  (Tr. III:20-22.)

The remaining victims did the same shortly thereafter.  (Tr. I:178-79, I:181; Tr. II:150-151; Tr.

III:22-26.)  The week after the robbery, another victim saw the Petitioner imitating the manner in

which a third victim cried during the incident.  (Tr. I:174-175, I:183-184.)  At trial, three of the

four victims testified consistently with the above facts, and prior testimony and a police

statement of the fourth were admitted in evidence.  (Tr. I-IV.)  In light of this evidence, it could

not be said that any error with respect to the waivers had "'a substantial and injurious effect or

influence in determining the jury's verdict.'"  <u>Brecht</u>, 507 U.S. at 637-38.

> ### C.   <u>The Petitioner's claim regarding the admission of Thethbun's statement to police is not properly before this Court and in no event can give rise to habeas corpus relief.</u>
>
> > 1.   <u>The Petitioner's claim regarding the admission of Thethbun's police statement should be treated as dismissed.</u>

This Court should treat Claim Two of the Petition, in which the Petitioner argues that

Thethbun's police statement was improperly admitted at his trial, as having already been

dismissed in its entirety.  The procedural history of this case makes clear that the Magistrate

Judge found Claim Two as a whole to be unexhausted in light of the Petitioner's failure to

exhaust one of the claims contained therein.  In moving to dismiss this action, the Respondent

argued as follows:

> Ground Two of the Petition . . . appears to include an unexhausted claim.
> That portion of the Petition begins by asserting that the "Trial Court
> allowed a highly prejudicial police report (witness statement) into
> evidence" where defense counsel "could not cross examine the person
> who allegedly gave the statement to the police."  (Pet. ¶ 12.)  This issue is

> referenced in his ALOFAR.  (ALOFAR at 18-23.)  However, the
> Petitioner continues in Ground Two of the Petition by complaining that
> the "Trial Court refused to allow into evidence that co-defendant was
> acquitted of all charges [sic]."  (Pet. ¶ 12.)  To the extent that that
> complaint about the trial court's failure to admit certain evidence
> constitutes a separate claim in support of habeas corpus relief, it must be
> deemed unexhausted, because it was nowhere raised within the
> Petitioner's ALOFAR.  (ALOFAR at 18-23).

(Docket Item No. 7 at 9; see also Docket Item No. 11 at 14 (Magistrate Judge's Report and

Recommendation) ("Respondent asserts that . . . the claim in Ground 2 that the trial court

'refused to allow into evidence that co-defendant was acquitted of all charges' [is

unexhausted].").)  Noting in part that "petitioner himself concedes that Ground 2 was not

presented to the SJC," the Magistrate Judge determined that "there can be little debate that

Ground 2 is unexhausted since it contains an issue that was never advanced to the SJC."  (Docket

Item No. 11 (quoting Docket Item No. 10).)

   The Magistrate Judge thus concluded that, unless the Petitioner moves for a stay, he must

withdraw Claim Two in its entirety or face dismissal.  (Docket Item No. 20-21.)  He resolved as

follows:

> I RECOMMEND that petitioner be given a period of THIRTY (30) days
> to file and serve a pleading in which he either (1) withdraws his
> unexhausted claims (Ground 2 and that portion of Ground 4 alleging that
> the [Massachusetts] Home Invasion statute is overbroad) or (2) seeks to
> stay the instant petition in accordance with the procedures set forth in
> [Rhines v. Weber, 544 U.S. 269 (2005),] and by making the showing
> required by the Rhines case.  If petitioner neither withdraws the
> unexhausted claims nor requests a stay within the time which the Court
> specifies, I FURTHER RECOMMEND that the Petition be DISMISSED.

(Id. (footnote omitted) (noting in footnote that if the Petitioner withdraws his unexhausted claims

he could not later pursue them, because they would be time-barred.)

   The Petitioner responded to this clear decision with an ambiguous statement that first

suggested an intent to act in accordance with the letter of the Magistrate Judge's decision, and

then implied a possible intent to read that decision creatively to his benefit.  (Docket Item No. 12

at 1.)  As he stated:

> Now comes the petitioner Louerth Sok and in accordance with the Report
> and Recommendations of [the Magistrate Judge] entered on January 25,
> 2007 the respondent [sic] withdraws his unexhausted claims.  More
> specifically respondent [sic] withdraws that portion of Ground 2 of his
> Petition which alleges that the Trial Court refused to allow into evidence
> that co-defendant was acquitted of all charges.  Respondent also
> withdraws that portion of Ground 4 which claims that the Home Invasion
> Statute is overbroad.

(Id.)  Consequently, this Court issued an order stating that the Petitioner, "responding to the

Magistrate Judge's Report and Recommendation, has withdrawn the claims identified in the

Report as unexhausted.  That being so, the case is REMANDED to [the Magistrate Judge] for a

Report and Recommendation on the merits of the remaining claims."  (Docket Item No. 13.)

In light of the clear determination by the Magistrate Judge and the Petitioner's expression

of intent to act consistently with it, the Respondent stated as follows in her Answer to the

Petition:

> The Respondent treats the petition as omitting Ground Two in its entirety
> and omitting that portion of Ground Four in which the Petitioner claimed
> that the Massachusetts Home Invasion Statute was overbroad, in
> accordance with the Report and Recommendations of Magistrate Judge
> Collings, the Petitioner's Response to the Report and Recommendations,
> and the Court's Order of March 6, 2007.

(Docket Item No. 14 at 1 n.1.)  The Petitioner did not challenge or otherwise respond to the

Respondent's interpretation of the procedural history of the case.

In light of the Magistrate Judge's clear determination that the Petitioner cannot proceed

on Claim Two and the other litigation events described above, the Petitioner's arguments in

support of a portion of Claim Two at this stage are presented inappropriately and should be

disregarded.

2.    The Appeals Court properly rejected the Petitioner's claim regarding the admission of Thethbun's police statement.

Even if this Court does review the Petitioner's claim regarding the admission of Thethbun's police statement, it should find it meritless.  While the claim cannot be allowed if it has not been exhausted, it may nevertheless be denied.  See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  The Appeals Court's rejection of the Petitioner's claim was not inconsistent with clearly established federal law, that is, a different outcome was not "'compelled by existing precedent.'"  Kater, 459 F.3d at 63 (quoting Curtis, 124 F.3d at 5).  Contesting its decision in this action, the Petitioner advances challenges based on state law and challenges based on federal law.  Those based on state law cannot, of course, give rise to federal habeas corpus relief.  See, e.g., Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").  Those invoking federal law are governed by Crawford v. Washington, 541 U.S. 36, 50-67 (2004).  There the Supreme Court held that the Confrontation Clause of the United States Constitution's Sixth Amendment generally bars the introduction at trial of an absent declarant's testimonial hearsay, unless the declarant is unavailable and there has been a prior opportunity for cross-examination.  Id.

The Petitioner cannot prevail on a Crawford claim here for multiple reasons.  To begin, as referenced above, Crawford extends only to statements that are "testimonial" in nature, and the Petitioner cannot demonstrate that Thethbun's police statement, as a matter of clearly

established Supreme Court precedent, fell within that category.  The <u>Crawford</u> Court expressly declined to define or to elaborate in conclusive terms on the meaning of "testimonial."  <u>Id.</u> at 68.  As it stated, "We leave for another day any effort to spell out a comprehensive definition of 'testimonial.'  Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."  <u>Id.</u> (footnote omitted).  In fact, it acknowledged that its approach "will cause interim uncertainty." <u>Id.</u> at 68 n.10.

Adding to that uncertainty, the Court likewise declined to precisely define "interrogation" for these purposes.  Instead it merely stated as follows:

> We use the term "interrogation" in its colloquial, rather than any technical legal, sense.  Just as various definitions of "testimonial" exist, one can imagine various definitions of "interrogation," and we need not select among them in this case.  [The declarant's] recorded statement, knowingly given in response to structured police questioning, qualifies under any conceivable definition.

<u>Id.</u> at 53 n.4.  This statement, in turn, only raised the next question of what is meant by "structured police questioning."  <u>Id.</u>  Struggling to construe the term, some courts in the immediate aftermath of the <u>Crawford</u> decision viewed a witness's voluntarily contacting police as one of several factors weighing against a finding of "structured police questioning."  <u>See, e.g.,</u> <u>State v. Barnes</u>, 854 A.2d 208, 211 (Me. 2004) (taking into account, among other factors, that "the police did not seek [the declarant] out.  She went to the police station on her own, not at the demand or request of the police."); <u>People v. Corella</u>, 18 Cal. Rptr. 3d 770, 776 (Cal. App. Ct. 2004) (considering, as one of several factors, that "[the declarant], not the police, initiated the 911 call to request assistance"); <u>State v. Forrest</u>, 596 S.E.2d 22, 27 (N.C. Ct. App. 2004) (taking into account, among other factors, that the statements at issue "were initiated by the victim" and that the detective "did not have to ask [the declarant] questions because she 'immediately

abruptly started talking'"); <u>People v. Moscat</u>, 777 N.Y.S.2d 875, 879 (N.Y. City Crim. Ct. 2004)
(stating, in evaluating status of 911 calls that, "[a] testimonial statement is produced when the
government summons a citizen to be a witness; in a 911 call, it is the citizen who summons the
government to her aid," and considering other factors).

 The foregoing is significant in this habeas corpus action.  By expressly declining to
define the terms "testimonial" and "interrogation," the Court itself foreclosed any argument that
any definition of those terms could be deemed clearly established federal law.  Indeed, its
pronouncements were tantamount to express holdings that such terms are *not* clearly established.
<u>See</u> <u>Crawford</u>, 541 U.S. at 75-76 (Rehnquist, C.J., joined by O'Connor, J., concurring) ("The
Court grandly declares that '[w]e leave for another day any effort to spell out a comprehensive
definition of 'testimonial.''  But the thousands of federal prosecutors and the tens of thousands of
state prosecutors need answers as to what beyond the specific kinds of 'testimony' the Court lists
is covered by the new rule.  They need them now, not months or years from now.  Rules of
criminal evidence are applied every day in courts throughout the country, and parties should not
be left in the dark in this manner." (citations omitted)); <u>Guilbeau v. Cain</u>, 2007 WL 2478888, at
*7 (W.D. La. 2007) (unpublished magistrate judge's report and recommendation) ("[W]hat does
and does not constitute 'testimonial' hearsay . . . is not 'clearly established' by the United States
Supreme Court").  Also left unsettled was whether a statement given by a victim like Thethbun
who voluntarily approaches police, as opposed to a Mirandized possible suspect in custody like
the declarant in <u>Crawford</u>, would fall within the term "structured police questioning."  (Docket
Item No. 15 Ex. B at SRA 52 (Thethbun's police statement) (beginning by stating, "I am here
tonight to talk to Det Conroy and Off Ung about a robbery that happened at my house on Linden
St.  No one has told me to come here, I came here because I want to be here and help the Police

find who did this.").) 541 U.S. 36. These factors were especially pronounced here, where the

Appeals Court decision of May 6, 2004, and the SJC decision of June 30, 2004, certainly fell

within the period of "interim uncertainty" contemplated in the <u>Crawford</u> decision of March 8,

2004. 541 U.S. at 68 n.10.

      Even if this Court concludes that the Confrontation Clause did protect the Petitioner

against the introduction of Thethubun's police statement, it must also conclude that the Petitioner

waived that protection. Such a waiver would have been effected by the Petitioner's opening the

door to the admission of Thethbun's police statement. Specifically, the Petitioner's counsel

requested the opportunity to introduce a portion of a transcript of Thethbun's prior testimony.

(Tr. IV:62:4 to IV:106:10.) It was in response to that request that the prosecutor asked to

introduce additional, contradictory portions of that testimony, as well as the equally

contradictory police statement that Thethbun had referred to in her testimony. (<u>Id.</u>) Before any

of such evidence was introduced, the trial judge determined that, if part of the testimony would

come in, the remainder of the testimony and the police statement (with appropriate redactions)

should also come in to complete the testimony. (<u>Id.</u>) She gave the Petitioner's counsel the

option of instead having none of the evidence introduced, and he declined. (<u>Id.</u>) Under these

circumstances, a waiver must be found. <u>See</u> <u>Evans v. Verdini</u>, 466 F.3d 141, 147 (1st Cir. 2006)

(concluding that defendant lacked due process and confrontation claims arising from

introduction through police witness of prior inconsistent statement made by declarant who

previously testified at trial, given that "it was the defense's cross examination of [the declarant],

not the Commonwealth's direct examination, that created the basis for the admission into

evidence of [the declarant's] prior inconsistent statement," and at that point, "the door was open

for the prosecution to impeach [the declarant's] testimony with his [prior inconsistent]

statement" through the police witness); cf. Bullock v. Carver, 297 F.3d 1036, 1057 (10th Cir.

2002) ("[A] defendant waives the protections guaranteed by the Clause when his counsel, for

reasonable strategic or tactical reasons 'stipulat[es] to the admission of hearsay evidence' or

elects not to cross-examine a witness." (quoting Hawkins v. Hannigan, 185 F.3d 1146, 1154-55

& n.5 (10th Cir. 1999))); United States v. Plitman, 194 F.3d 59, 64 (2d Cir. 1999) ("[D]efense

counsel may waive a defendant's Sixth Amendment right to confrontation where the decision is

one of trial tactics or strategy that might be considered sound.").

      Such a conclusion is fully consonant with Crawford.  Significantly, the Court there

indicated as follows:

> [The test previously prescribed by Ohio v. Roberts, 448 U.S. 56 (1980),]
> allows a jury to hear evidence, untested by the adversary process, based on
> a mere judicial determination of reliability.  It thus replaces the
> constitutionally prescribed method of assessing reliability with a wholly
> foreign one.  In this respect, it is very different from exceptions to the
> Confrontation Clause that make no claim to be surrogate means of
> assessing reliability.  For example, the rule of forfeiture by wrongdoing
> (which we accept) extinguishes confrontation claims on essentially
> equitable grounds; it does not purport to be an alternative means of
> determining reliability.

541 U.S. at 62.  Certain important principles may be drawn from this passage.  First, a defendant

could lose his confrontation rights based on rationales that do not amount to "surrogate means of

assessing reliability."  Id.  Second, among such rationales are those that "extinguish

confrontation claims on essentially equitable grounds."  Id.  And third, "the rule of forfeiture by

wrongdoing" is but one "example" of such "exceptions."  Id.

      Such principles justify the conclusion that a defendant should be found to waive the

protections of the Confrontation Clause with respect to an out-of-court statement offered as

rebuttal to evidence that he has affirmatively placed in issue.  A rule recognizing such a waiver

"does not purport to be an alternative means of determining reliability," but is based "on

essentially equitable grounds."  Id.  At is core, the Confrontation Clause serves to promote

fairness and justice in the time-honored practice of ascertaining the truth through trials.  It does

so, quite simply, by ensuring that the trier of fact does not receive half of the story.  The outcome

advocated by the Petitioner here would be in derogation of those interests of promoting justice,

fairness, and truth-seeking.  It would essentially allow a defendant to:  pick and choose those

statements, or even those portions of a single statement, by an unavailable witness that suit his

interests; reap the benefits of the fact that the prosecution cannot cross-examine; and then block

the prosecution from offering the other half of the story by invoking his confrontation rights and

complaining of the same inability to cross-examine from which he has just profited.  Indeed, that

is little different than what the Petitioner here sought to do at his trial.  While purporting not to

object to the introduction of Thethbun's internally-inconsistent testimony in its entirety, the

Petitioner's counsel requested the opportunity to introduce only that portion of it that benefited

him, and he sought to exclude her contradictory statement to police.  (Tr. IV:62:4 to IV:106:10.)

Surely this is not the type of approach that the Framers, upon whose apparent intent the

Crawford decision was based, sought to protect.  541 U.S. 36.

The rationale for such a waiver rule is essentially no different than that underlying the

firmly-established rule that "'a defendant who takes the stand in his own behalf cannot then

claim the privilege against cross-examination on matters reasonably related to the subject matter

of his direct examination.'"  Ohler v. United States, 529 U.S. 753, 759 (2000) (quoting

McGautha v. California, 402 U.S. 183, 215 (1971), and "conclud[ing] that a defendant who

preemptively introduces evidence of a prior conviction on direct examination may not on appeal

claim that the admission of such evidence was error").  As has long been recognized:

> Where an accused party waives his constitutional privilege of silence,
> takes the stand in his own behalf and makes his own statement, it is clear

> that the prosecution has a right to cross-examine upon such statement with the same latitude as would be exercised in the case of an ordinary witness, as to the circumstances connecting him with the alleged crime. While no inference of guilt can be drawn from his refusal to avail himself of the privilege of testifying, he has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts.

Fitzpatrick v. United States, 178 U.S. 304, 315 (1900).

While the foregoing should be sufficient to establish that the Appeals Court's decision was not in conflict with clearly established federal law, it is worth noting that further support for the arguments above may be found in lower federal court opinions. In particular, a number of courts have found out-of-court statements not inadmissible under Crawford where the defendant had opened the door to their introduction. See United States v. Acosta, 475 F.3d 677, 683-85 (5th Cir. 2007) (concluding that, even if the introduction of certain out-of-court statements made by a declarant who previously testified for the government at defendant's trial would otherwise be barred under Crawford, it was not error to admit them where the defendant opened the door to their admission through his cross-examination of witness, stating in part that "'[i]f a defendant injects otherwise inadmissible evidence, 'the defense cannot later object to such 'invited error''" (quoting United States v. Green, 272 F.3d 748, 754 (5th Cir. 2001))); Guilbeau, 2007 WL 2478888, at *11 (unpublished magistrate judge's report and recommendation) (concluding, as to Crawford claim in habeas corpus case, that "even if [the declarant's] statements had been admitted for purposes of the truth, their admission, under the circumstances of this case, was permissible because [the defendant] invited the error," explaining that "[a] defendant cannot open the door to inadmissible evidence and then later object to such 'invited error,'" and noting that "[the declarant's] statements were not presented during the State's case in chief . . . but [on rebuttal]" (quoting Acosta, 475 F.3d at 683)); cf. Moses v. Payne, 2007 WL 1101494, at *3

(W.D. Wash. 2007) (unpublished) (concluding in habeas corpus case that introduction of out-of-court statement was not barred by Crawford where petitioner had opened door to it through his opening and cross-examination of witness, suggesting that statement was thus offered for a matter other than its truth), certificate of appealability granted, 2007 WL 1687504 (W.D. Wash. 2007); United States v. Lash, 2006 WL 1562348, at *2 (E.D. La. 2006) (unpublished) (ordering in response to motion in limine that, if defendant suggests certain fact to jury, prosecution may offer testimony regarding that limited portion of out-of-court statement necessary to refute defendant's claim, noting that such portion would not be incriminating or offered as substantive proof of guilt, and concluding that approach would satisfy Crawford).

While a different view was taken by the United States Court of Appeals for the Sixth Circuit in United States v. Cromer, that view should be rejected. 389 F.3d 662, 679 (6th Cir. 2004). First, the Cromer court failed to acknowledge the above-quoted language from Crawford. Id. Second, in a later decision, the Sixth Circuit Court of Appeals implied that testimony offered in response to a defendant's opening the door might be allowable if it is confined to that which is necessary for rebuttal. See Untied States v. Pugh, 405 F.3d 390, 400 (6th Cir. 2005) (concluding that the defendant "may have 'opened the door' to allow the Government to provide an alternative reason for [the police interview of the declarant], but the Government overstepped constitutional bounds by asking [a police witness] if [the declarant] identified the defendants as the robbers."). Such describes the situation at the Petitioner's trial, where Thethbun's statement to police was necessary to demonstrate that she had made statements directly contradicting her trial testimony. At the very least, the above survey of cases on the issue of waiver by opening the door demonstrates that a contrary rule was certainly not "'compelled by existing precedent.'" Kater, 459 F.3d at 63 (quoting Curtis, 124 F.3d at 5).

Even if the admission of Thethbun's police statement had constituted error, such error must be deemed harmless. First, once again, the sheer weight of evidence even without Thethbun's police statement must be considered. See supra Section II.B. See, e.g., Brecht, 507 U.S. at 639. Second, the jury already heard inconsistencies and indications of illness in the reading of her prior testimony. (Tr. IV:96:9 -106:9.) The reading of the police statement only added further inconsistencies. (Id.) As a result, both the testimony and the police statement called into question her overall credibility, and minimized any likelihood that jurors would have put much faith in any statements by her inculpating the Petitioner. Moreover, in his Memorandum, the Petitioner has offered several reasons to doubt the veracity of Thethbun's statements, which reasons would have been no less clear to a jury. (Docket Item No. 22 at 21-30.) Examples are the fact that she did not speak English well and needed the assistance of a translator. (Id.) To the extent that any such reasons are valid, they would only serve to reinforce the notion that the admission of her police statement was harmless.

> **D.      The Petitioner's challenge to the sufficiency of the evidence must fail, because the one charge to which it refers did not result in a sentence or even a judgment.**

The Petitioner also cannot prevail on Claim Three of the Petition, because the one charge as to which he claims there was insufficient evidence did not result in a sentence or even a judgment. Specifically, while the Petitioner summarized this claim in the Petition and in the heading to his discussion of Claim Three in his Memorandum by stating that "[t]he totality of the facts and circumstances were against the weight of the evidence," he made clear in his Memorandum that the claim concerns *only* the evidence offered to prove the offense of indecent assault and battery. (Docket Item No. 1 ¶ 12; Docket Item No. 22 at 31-34.) Specifically, the Petitioner began the relevant section of his Memorandum by stating:

> Defendant also asserts that the Court should have granted defendant's
> Motion for a Required Finding of Not Guilty on the indecent assault and
> battery charges as there was no evidence to support a conviction beyond a
> reasonable doubt.  (Day 4, pg. 152 and Trial Court's Disposition, Day 4,
> pg. 35, 36.)  The Court acknowledged that there was no evidence of sexual
> gratification.  (Day 4, pg. 33-36.)

(Docket Item No. 22 at 31.)[9]  The remainder of that section of the Memorandum fails to make

any reference to any other charges against the Petitioner, or to discuss any facts or legal

principles that would not apply to the indecent assault and battery charge.  (Docket Item No. 22

at 31-34.)[10]

Indeed, the Memorandum section dealing with Claim Three calls attention to the motion

for a required finding of not guilty that the Petitioner made on the fourth day of trial.  (Docket

Item No. 22 at 33.)[11]  While the Petitioner's trial counsel began his argument on that motion by

stating that he was "going to renew [his] motion with regard to all of the indictments," he then

proceeded to discuss only the indictment for indecent assault and battery.  (Tr. IV:148:23 to

IV:160:17.)  In fact, the relevant portion of the trial transcript consists of eleven and a half pages

devoted to discussion by the Petitioner's counsel, the prosecutor, and the judge of the indecent

assault and battery charge and no discussion of any other charge.  (Id.)  That the Petitioner

intended to limit his argument here to the indecent assault and battery charge is further clear

_____

[9] The above citations to the transcript of the fourth day of trial do not appear to be accurate.
(Docket Item No. 22 at 31; Tr. IV:33 to IV:36, IV:152.)

[10] While the Petitioner did refer to his "convictions" at certain points, his use of the plural should
not be construed as an indication that he is challenging the sufficiency of the evidence as to
additional charges.  (Docket Item No. 22 at 31-34.)  First, in summarizing his argument in the
section's first sentence, he did not use the plural, but referred to the "evidence to support a
*conviction*."  (Id. at 31 (emphasis added).)  Second, elsewhere he did use the plural term
"charges" when clearly referring to the indecent assault and battery count.  (Id.)  Third, he
suggested in his Petition that he is under the erroneous impression that he was convicted on "4
counts [of] Indecent A&B."  (Docket Item No. 1 ¶ 5.)  Such factors, in addition to those
discussed above, make the limited scope of his claim clear.

from the fact that it is very similar to the argument that the Appeals Court treated as being so limited. (Docket Item No. 1 Ex. 1 at 32-34 (Petitioner's Appeals Court brief); Docket Item No. 1 Ex. 3 (Appeals Court decision) (stating that "[t]he defendant appeals, alleging that the trial judge improperly . . . denied the defendant's motion for a required finding of not guilty on the charge of indecent assault and battery," addressing that allegation, and making no reference to claim of insufficient evidence as to other charges); Docket Item No. 22 at 31-34 (Petitioner's Memorandum in support of Petition).)

The Petitioner cannot possibly obtain federal habeas corpus relief as a result of the disposition of his assault and battery charge. Section 2254 of Title 28 authorizes a federal court to "entertain an application for a writ of habeas corpus in behalf of a person *in custody* pursuant to the *judgment* of a State court only on the ground that he is *in custody* in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (emphasis added). Thus, "[t]he first showing a § 2254 petitioner must make is that he is 'in custody pursuant to the judgment of a State court.'" Lackawanna County District Attorney v. Coss, 532 U.S. 394, 401 (2001) (concluding that petitioner could not bring habeas petition directed solely at convictions for which he was no longer serving sentences); see also Maleng v. Cook, 490 U.S. 488, 490-91 (1989) (stating general rule that habeas corpus statute "require[es] that the habeas petitioner be 'in custody' under the conviction or sentence under attack at the time his petition is filed" and noting that "in custody" requirement is jurisdictional); Allen v. Attorney General, 80 F.3d 569, 572 (1st Cir. 1996) (indicating, in affirming dismissal of § 2254 habeas corpus petition seeking to block state prosecution, that "[o]rdinarily, a state criminal case is ripe for the ministrations of a federal habeas court only after completion of the state proceedings (that is, after the defendant

---

[11] Here, too, the Petitioner's citations to the transcript of the fourth day of trial do not appear

has been tried, convicted, sentenced, and has pursued available direct appeals),” but recognizing

exception where petitioner claims that trial would constitute double jeopardy); Prince v. Bailey,

464 F.2d 544, 545 (5th Cir. 1972) (concluding that district court lacked jurisdiction to consider

habeas petition, because at the time of its filing, the petitioner was incarcerated awaiting trial and

thus “was not in custody of [state] authorities ‘pursuant to the judgment of a State court’, 28

U.S.C.A. § 2254(a)”); Higgins v. State of Rhode Island, 187 F.3d 622, 1998 WL 185812, at *1

(1st Cir. 1998) (unpublished) (“[Section] 2254 was wholly inapplicable as a basis for

jurisdiction.  Section 2254 pertains to a prisoner in custody pursuant to a *judgment of conviction*

of a state court and [the petitioner] has not yet been convicted of the pending [state] charges.”

(emphasis in original)).

        The Petitioner cannot make that showing with respect to the indecent assault and battery

charge.  As that charge was placed on file with his consent, it did not give rise to any sentence

and did not even constitute a judgment.  (Docket Item No. 7 Ex. A.)  The Appeals Court

explained as follows in deciding his case:

> The defendant may not appeal the trial judge’s filing of the charge of
> indecent assault and battery, a topic which the judge discussed with the
> defendant at sentencing.  “It has long been the practice in this
> Commonwealth that a judge, after a plea of guilty or a conviction may
> order that the indictment be placed on file.  Absent exceptional
> circumstances [not found here], we do not consider appeals on assignment
> of error on indictments placed on file since no appeal may come before us
> until after judgment, which in criminal cases is the sentence.  However,
> since the placing of a case on file does, inter alia, suspend, for as long as
> the case remains on file, a defendant’s right to appeal alleged error in the
> proceeding, the defendant must consent to the filing.”  As the defendant
> knowingly consented to the court's placing of this charge on file, he may
> not now appeal that conviction.

accurate.  (Docket Item No. 22 at 33; Tr. IV:177.)

(Docket Item No. 1 Ex. 3 (quoting, without citations, <u>Commonwealth v. Delgado</u>, 367 Mass. 432, 437-438 (1975)).)  That court's description of the status under Massachusetts law of a guilty finding that has been placed on file was consistent with prior pronouncements by the SJC.  <u>See</u> <u>Commonwealth v. Bianco</u>, 390 Mass. 254, 257 (1983) (stating that placement on file of indictment after guilty verdict "is not a final judgment but is a mere suspension of active proceedings"); <u>Commonwealth v. Delgado</u>, 367 Mass. 432, 438 (1975) (noting that sentencing, not placement of indictment on file, constitutes judgment).  It must be accepted as accurate in this proceeding.  <u>See, e.g.</u>, <u>Bradshaw</u>, 546 U.S. at 76 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); <u>Estelle</u>, 502 U.S. 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").  It follows that the Petitioner is not in custody pursuant to a judgment arising from the indecent assault and battery charge and cannot obtain habeas corpus relief as a result of it.[12]

### E.  The Petitioner's vagueness claim must fail, because it is based on challenges to the wisdom of a state statute, and on alleged ambiguities that did not impact him and have been resolved.

Claim Four of the Petition, wherein the Petitioner argues that the Massachusetts home invasion statute is unconstitutionally vague, must likewise be rejected.  The Appeals Court's dismissal of his vagueness challenge neither was contrary to nor involved an unreasonable application of Supreme Court precedent.  The Respondent agrees that the applicable version of M.G.L. c. 265, § 18C is the one that was in effect in 1999.  That version read:

> Whoever knowingly enters the dwelling place of another knowing or
> having reason to know that one or more persons are present within or

---

[12] The Respondent respectfully requests that, if this Court concludes that the Petitioner's third claim challenges the sufficiency of the evidence as to other charges, the Respondent be afforded the opportunity to file a supplemental brief addressing such sufficiency challenges.

> knowingly enters the dwelling place of another and remains in such
> dwelling place knowing or having reason to know that one or more
> persons are present within while armed with a dangerous weapon, uses
> force or threatens the imminent use of force upon any person within such
> dwelling place whether or not injury occurs, or intentionally causes any
> injury to any person within such dwelling place shall be punished by
> imprisonment in the state prison for life or for any term of not less than
> twenty years.  Whoever commits said crime while being armed with a
> firearm, shotgun, rifle, machine-gun, or assault weapon shall be punished
> by imprisonment in the state prison for 20 years.  Said sentence shall not
> be reduced to less than ten years nor shall the person convicted be eligible
> for probation, parole, furlough, work release or receive any deduction
> from his sentence for good conduct; provided however, that the
> commissioner of correction may, on the recommendation of the warden,
> superintendent or other person in charge of a correctional institution, or
> the administrator of a county correctional institution, grant to such
> offender a temporary release in the custody of an officer of such institution
> for the following purposes only: to attend the funeral of next of kin or
> spouse; to visit a critically ill close relative or spouse; or to obtain
> emergency medical services unavailable at such institution. The provisions
> of section 87 of chapter 276 relative to the power of the court to place
> certain offenders on probation shall not apply to any person 17 years of
> age or over charged with a violation of this subsection. The sentence
> imposed upon a person who, after having been convicted of violating any
> provision of this section, commits a second or subsequent offense under
> the provisions of this section shall not be suspended or placed on
> probation.

M.G.L. c. 265, § 18C (1999) (amended 2004).  The Respondent also agrees that the vagueness

doctrine requires a penal statute to "'define the criminal offense with sufficient definiteness that

ordinary people can understand what conduct is prohibited and in a manner that does not

encourage arbitrary and discriminatory enforcement.'"  (Docket Item No. 22 at 34 (quoting

Kolender v. Lawson, 461 U.S. 352, 357 (1983).)

However, much of the Petitioner's argument in support of this claim does not even

advance a true vagueness challenge.  Rather, it questions the Massachusetts Legislature's

wisdom in criminalizing certain conduct and setting penalties.  For example, the Petitioner

complains or suggests that the statute:  imposes a more severe penalty than that which is

available for what he considers to be a less serious offense; imposes a severe penalty even where

no physical injury is caused; allows for punishment of those who may be otherwise well-

meaning; and does not require that the individual who is threatened or harmed be an owner of, an

occupant of, or one with permission to be at the dwelling.  (Id. at 35-37.)  The fact that his

challenge is to the wisdom of the statute, not its clarity, is underscored by the factual scenarios

he offers to illustrate his views.  (Id. at 36-37.)  At the conclusion of almost every scenario, he

indicates is a statement to the effect that the conduct at issue would clearly be punishable under

the home invasion statute.  (Id. at 36-37.)  "[A]ll of the above fact patterns fit squarely within the

requirements of the Home Invasion Statute," he asserts.  (Id. at 37.)  Thus, contrary to the

Petitioner's assertion, his scenarios are not "indicative of the absence of clarity of said statute

when applied," but the absence of a true vagueness challenge.  (Id. at 36.)

Complaints of the type discussed above are more appropriately directed to the

Massachusetts Legislature.  They certainly do not provide a basis for a federal court to issue a

writ of habeas corpus.  See, e.g., Neely v. Newton, 149 F.3d 1074 (10th Cir. 1998) (affirming in

habeas corpus case that "[t]his court does not judge the wisdom of the legislature's enactment of

the [statute at issue]" (citing Bensing v. United States, 551 F.2d 262, 265 (10th Cir. 1977) ("A

court must be ever alert to refuse to sit as a super-legislature to weigh the wisdom of legislation,

or to invoke the Due Process Clause so as to strike down laws or regulations simply because the

Court may believe that they are unwise or improvident."))); cf., e.g., Cohen v. Beneficial Indus.

Loan Corp., 337 U.S. 541, 550-51 (1949) ("The Federal Constitution does not invalidate state

legislation because it fails to embody the highest wisdom or provide the best conceivable

remedies.").

The Petitioner appears to offer only two arguments as to why he believes the home invasion statute is actually *unclear*, as opposed to poorly thought-out.  The first concerns the fact that the statute first stated, "nor shall the person convicted be eligible for probation" and then provided that "[t]he provisions of section 87 of chapter 276 relative to the power of the court to place certain offenders on probation shall not apply to any person 17 years of age or over charged with a violation of this subsection" and that "[t]he sentence imposed upon a person who, after having been convicted of violating any provision of this section, commits a second or subsequent offense under the provisions of this section shall not be suspended or placed on probation."  M.G.L. c. 265, § 18C (1999).  With respect to this language, the Petitioner argues as follows:

> Despite the language of the statu[t]e that permits probation, the [Appeals Court in Commonwealth v. Berte, 57 Mass. App. Ct. 29, 781 N.E.2d 14 (2003)] seems to conclude that "probation is prohibited" but then goes on to say that . . . probation is prohibited only to those over age 17, or those who committed a second offense. . . .  The statu[t]e clearly allows for probation yet for some reason the Appeals Court of Massachusetts states it does not. . . .  So why is the reference to and allowance of probation in the statu[t]e contained in the statu[t] if it has no meaning[?]. . . .  [T]he original home invasion statu[t]e did not mention or exclude the possibility of probation or parole.  The 1998 version attempted to address the issue but it was so confusing that . . . no one including the courts could rationalize the meaning.

(Docket Item No. 22 at 42.)

There are several problems with this argument.  First, nowhere did the text of the statute or the opinion in Berte state that probation was allowed  "The statute beg[an] by prohibiting probation, [went] on to prohibit probation for anyone over the age of seventeen, and conclude[d] by prohibiting probation for repeat offenders."  Berte, 57 Mass. App. Ct. at 34, 781 N.E.2d at 18. It may have been redundant, but it was not inconsistent or unclear about its disallowance of probation.  The Berte court's opinion was equally unequivocal, stating that "the only rule to be

40

gleaned from the statute as written is that probation is prohibited.  It may not apply to those over age seventeen, nor to those who have committed a second offense under the statute, nor to anyone who is convicted of violating this law."  57 Mass. App. Ct. at 34, 781 N.E.2d at 19.

Second, the Petitioner's allegation that "no one including the courts could rationalize [the statute's] meaning" is quite obviously undercut by the fact that, as he acknowledges, the Appeals Court *did* rationalize its meaning.  (Docket Item No. 22 at 42.)  Third, given that the Appeals Court has interpreted that provision, its meaning is not open to debate in this proceeding.  See, e.g., Bradshaw, 546 U.S. at 76 ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); Estelle, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

The second argument as to why the Petitioner believes that the statute was unclear concerns the fact that it stated, "[w]hoever commits said crime while being armed with a firearm, shotgun, rifle, machine-gun, or assault weapon shall be punished by imprisonment in the state prison for 20 years" and then stated that "[s]aid sentence shall not be reduced to less than ten years."  M.G.L. c. 265, § 18C (1999) (amended 2004).  This argument is foreclosed to him in light of the well-established principle that "[v]agueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis."  Maynard v. Cartwright, 486 U.S. 356, 361 (1988); accord, e.g., Love v. Butler, 952 F.2d 10, 13-14 (1st Cir. 1991) (noting that even a facial challenge "must first be considered in light of the fact of the case—i.e., on an as applied basis).  Here, to the extent that any question could be raised based on the combination of these phrases, it could only be whether the statute provides for a mandatory minimum sentence of twenty years or provides for

a term of between ten and twenty years.  Under no circumstances could the statute be read to provide for a term of less than twenty years.  In the Petitioner's case, the Appeals Court ordered that his original sentence on the home invasion conviction be reduced to a term between ten and twenty years, and the Superior Court accordingly resentenced him to a ten-to-twelve year term. (Docket Item No. 7 Exs. B, C.)  It follows that the incarceration provisions of the home invasion statute cannot be found vague as applied to him.

Rejection of the Petitioner's vagueness challenge to the statute's sentencing provisions can also be reached by application of a different principle.  That principle, generally applied in the context of statutory aggravating factors, recognizes that vagueness in a state statute may be cured by a court-adopted narrowing construction.  See, e.g., Bell v. Cone, 543 U.S. 447, 453-60 (2005).  As reflected above, the incarceration provisions of the home invasion statute have been interpreted in the more lenient of the possible ways.  (Docket Item No. 1 Ex. 3 (Appeals court opinion) ("[A]s in Berte, '[t]he sentence on the conviction for home invasion committed with a firearm is vacated, and the case is remanded for resentencing on this count with a maximum sentence not to exceed twenty years, and a minimum sentence of ten years imprisonment.'" (citation omitted).)  See also Berte, 57 Mass. App. Ct. at 32, 781 N.E.2d at 17 (interpreting the sentencing structure "as simply another format for stating the minimum and maximum sentencing range").   The Petitioner is thus incorrect in stating that the Berte court "raise[d] the specter of having to guess as to the intent of the legislature regarding [its] intention concerning the length of sentence to be imposed under a conviction pursuant to this statute" and that "some of the best legal minds in the Commonwealth are struggling , with not success, to make logic and sense out of the statute."  (Docket Item No. 22 at 39, 43.)  Any vagueness that may have existed has been resolved.  Here, too, the Petitioner cannot demonstrate that the Appeals Court's

decision was contrary to or involved an unreasonable application of Supreme Court precedent. This claim, like his others, clearly does not entitle him to federal habeas corpus relief.

## III.    CONCLUSION

For the foregoing reasons, the Petition should be denied in its entirety, and judgment should be entered against the Petitioner and in favor of the Respondent.

Respectfully submitted,

MARTHA COAKLEY
ATTORNEY GENERAL


/s/ Randall E. Ravitz
Randall E. Ravitz (BBO # 643381)
Assistant Attorney General
Criminal Bureau
One Ashburton Place
Boston, Massachusetts  02108
(617) 727-2200, ext. 2852

Dated:  November 23, 2007


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the Electronic Case Filing system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on the date set forth below.


Dated:  November 23, 2007                    /s/ Randall E. Ravitz
                                             Randall E. Ravitz